Sharon **YELDELL**, Karan J. Cremer, Plaintiffs–Appellees,

**Russell Starkey, John Rohde, Ellie Higginbotham, Intervenors– Plaintiffs Appellees,**

v.

**COOPER GREEN HOSPITAL, INC.,** Jefferson County Personnel Board, Defendants,

**Reuben Davis, individually and in his official capacity as a Jefferson County Commissioner; Jefferson County Commission; Jim Gunter, in his individual capacity and official capacity as Jefferson County Commissioner; John Katopodis, individually and in his official capacity as Jefferson County Commissioner; Chris McNair, individually and in his official capacity as Jefferson County Commissioner; David Orange, individually and in his official capacity as Jefferson County Commissioner, Defendants–Appellants.**

No. 91–7021.

United States Court of Appeals, Eleventh Circuit.

March 30, 1992.

---

Charles S. Wagner, Jeffrey Monroe Sewell, Asst. County Attys., Birmingham, Ala., for petitioners-appellants.

Samuel C. Campisi, Ann C. Robertson, Gordon, Silberman, Wiggins & Childs, Birmingham, Ala., for defendants.

Before FAY and HATCHETT, Circuit Judges, and GIBSON *, Senior Circuit Judge.

FAY, Circuit Judge:

County Commissioners Reuben Davis, Jim Gunter, John Katopodis, Chris McNair, and David Orange were sued for civil rights violations in their personal and official capacities. In a motion for summary judgment the commissioners challenged the lawsuit in both capacities. The basis of the

commissioners' motion in their personal capacities was legislative immunity or, in the alternative, qualified immunity. The district court granted partial summary judgment, but found no merit in the commissioners' immunity arguments, denying that part of their motion. On appeal, the commissioners challenge only the district court's denial of summary judgment in their personal capacities. For the reasons that follow, we REVERSE the district court and hold that Commissioners Gunter, Katopodis, McNair and Orange are entitled to summary judgment in their personal capacities on the basis of legislative immunity. However, we AFFIRM the district court's denial of Commissioner Davis' personal capacity summary judgment motion.

## I.

The defendants-appellants are all members or former members of the Jefferson County Commission, the governing body of Jefferson County, Alabama, a political subdivision of the State of Alabama. In 1985, pursuant to a federal district court consent decree, the Jefferson County Commission was changed from a three-member at-large elected commission to a five-member district form of government to ensure greater minority representation on the Commission. Elections for the five seats were held in November, 1986. The consent decree provided that, immediately following the 1986 elections, the new five member commission would "distribute the powers and duties conferred by law upon the county commission and the members thereof as they deem fit and efficient." *Taylor v. Jefferson County Commission*, No. CV–84C–1730–S at 2 (N.D.Ala. Aug. 17, 1985) (consent decree). Therefore, as the first order of business, the newly elected commissioners adopted a resolution dividing the responsibility for county government into five functional areas: (1) Department of Finance and General Services, (2) Department of Roads and Transportation, (3) Department of Environmental Services, (4) Department

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

of Health and Human Resources, and (5) Department of Community and Economic Development. Each Commissioner took control of a different area. Commissioner Reuben Davis, the first black commissioner elected to the Jefferson County Commission, took responsibility for Health and Human Services.

As the commissioner in charge of Health and Human Services, part of Commissioner Davis' task was oversight of the local hospital, Cooper Green. This meant that Commissioner Davis was responsible for reviewing personnel policies and the personnel recommendations of the chief executive officer of the hospital. It is out of this process of personnel policy administration and review that the current dispute arose.

The plaintiffs-appellees, except for Russell Starkey, are or were at one time employees of Cooper Green Hospital and were either demoted, fired, or passed up for a job opportunity as a result of some action taken by Commissioner Davis. *Karan J. Cremer*, a white woman, was removed as the temporary Nursing Supervisor for Maternal/Infant Care and Elizabeth Clark Bone, a black woman, was hired to fill the position on a permanent basis. *Russell Starkey*, a white man who was hired as an independent contractor to perform certain administrative services at the hospital, had his contract terminated and was not hired for any one of several positions within the hospital for which he applied. *Ellie Higginbotham*, a white woman who worked as Senior Hoosekeeping Supervisor at the hospital, was fired. *Sharon Yeldell*, a black woman, was demoted from Acting Director of Hospital Education to the position of Assistant Director of Nursing Services with a commensurate decrease in salary. *John Rohde*, a white man and Chief Executive Officer of the hospital was, amongst other things, suspended for five days without pay.

Several complaints were made to Commissioners Gunter, Katopodis, McNair, and Orange regarding the decisions of Commissioner Davis at Cooper Green Hospital. The commissioners, however, chose not to act on these complaints.

Based on the facts set out above, in December of 1989, Sharon Yeldell brought suit against the Jefferson County Commission, the Jefferson County Personnel Board, and Jefferson County Commissioners Reuben Davis, Jim Gunter, John Katopodis, Chris McNair, and David Orange both in their personal and official capacities. Plaintiff Karan J. Cremer joined Yeldell's suit and was soon followed by plaintiffs-intervenors, John Rohde, Ellie Higginbotham, and Russell Starkey. Their complaints allege civil rights abuses, predominantly race discrimination, in violation of 42 U.S.C. §§ 1981 and 1983, Title VII of the Civil Rights Act of 1964, and state law.

In a motion for summary judgment, the Jefferson County Commission and the county commissioners in their official and personal capacities moved to dismiss the plaintiffs' claims. The commissioners' request for summary judgment in their personal capacities was based on legislative immunity or, in the alternative, qualified immunity. The district court granted partial summary judgment, dismissing the plaintiffs' § 1981 claims on the basis of the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), but denied summary judgment as to all other claims. On appeal, the commissioners argue that the district court erred in denying their motion for summary judgment on the basis of either legislative or qualified immunity.[1]

## II.

We have jurisdiction to hear this appeal under 28 U.S.C. § 1291 [2] and the "collateral

---

1. No party seeks review of the district court's order: dismissing the plaintiffs' § 1981 claims; denying Jefferson County Commission's motion for summary judgment; and denying the commissioners' motion for summary judgment involving the claims against them in their *official*

*capacities.* These matters are, therefore, not before this court.

2. 28 U.S.C. § 1291 states in relevant part: "The courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States...."

**1060**

order" doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *See Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Rich v. Dollar*, 841 F.2d 1558 (11th Cir.1988).

Our review here is *de novo* and we use the same test that the district court would apply. *See Akins v. Snow*, 922 F.2d 1558, 1560 (11th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 2915, 115 L.Ed.2d 1079 (1991); *Tackitt v. Prudential Ins. Co.*, 758 F.2d 1572, 1574 (11th Cir.1985). This means that we follow the mandate of Federal Rule of Civil Procedure 56(c), which provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The commissioners seek immunity from suit in their personal capacities. Because of the great confusion that so often surrounds claims and defenses involving personal capacity and official capacity liability, *see Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985), we begin our review of the issues in this appeal with a brief description of the differences between personal capacity and official capacity lawsuits.

■ "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Id.* at 165–66, 105 S.Ct. at 3105 (citations omitted) (quoting *Monell v. Department of Social Services*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55–56 L.Ed.2d 611 (1978)). In other words, a plaintiff in an action against a government official in his personal capacity can recover only against the official's personal assets. The assets of the governmental entity are not accessible. The reverse is true in an official capacity lawsuit. Furthermore, "to establish *personal* liabili-

ty in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.... [I]n an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law." *Id.* 473 U.S. at 166, 105 S.Ct. at 3105 (citations omitted).

Yet another distinction between official-capacity and personal-capacity lawsuits is the fact that "officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law." *Hafer v. Melo*, — U.S. —, 112 S.Ct. 358, 362, 116 L.Ed.2d 301 (1991). Finally, both this court and the Fifth Circuit have held that Title VII actions are not appropriately brought against government officials in their personal capacities. Such suits may be brought only against individuals in their official capacity and/or the employing entity. *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991); *see also Harvey v. Blake*, 913 F.2d 226 (5th Cir.1990).

Appellees in this case are suing the commissioners in their official as well as their personal capacities. However, this appeal addresses only the question of whether the district court erred in denying summary judgment to the commissioners in their *personal capacities*. Our list of possible issues to consider is, therefore, necessarily narrowed to the question of whether the commissioners are entitled to summary judgment based on either legislative or qualified immunity.

*Legislative Immunity*

This country has always recognized the need to protect its national legislators from suit for acts done within the realm of their legislative duties. This need was expressed in both the Articles of Confederation and the Constitution. Article V of the Articles of Confederation states: "Freedom of speech and debate in Congress shall not be impeached or questioned in any court or place out of Congress...." Article I, section 6 of the Constitution states: "[F]or any Speech or Debate in either House, [the Senators and Representatives] shall not be

questioned in any other Place." The Supreme Court in *Tenney v. Brandhove*, 341 U.S. 367, 373, 71 S.Ct. 783, 786, 95 L.Ed. 1019 (1951), explained:

> The reason for the privilege is clear.... "In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, that however powerful, to whom the exercise of liberty may occasion offence." II Works of James Wilson (Andrews ed. 1896) 38.

For our founding fathers, then, the growth of democracy and the right of the nation's legislators to be free from civil suit went hand-in-hand. It was well understood that for a democratic government to function democratically, our elected officials, when acting in their legislative capacity, must answer only to their constituents and only on election day.[3] As the Court pointed out in *Tenney:* "Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators." *Id.* at 377, 71 S.Ct. at 788;

*see also Gravel v. United States*, 408 U.S. 606, 616, 92 S.Ct. 2614, 2622, 33 L.Ed.2d 583 (1972) ("The Speech or Debate Clause was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch. It thus protects Members against prosecutions that directly impinge upon or threaten the legislative process.").

■ Legislative immunity, as it is embodied in the Constitution, applies only to *national legislators.* In *Tenney*, however, the Supreme Court extended this privilege to *state legislators* for actions taken "in the sphere of legitimate legislative activity." *Tenney*, 341 U.S. at 376, 71 S.Ct. at 788.[4] The form of legislative immunity recognized in *Tenney* is premised on the common law and has been applied in essentially the same fashion as Article I, § 6. *Supreme Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 733, 100 S.Ct. 1967, 1975, 64 L.Ed.2d 641 (1980). Furthermore, in this circuit, the holding of *Tenney* has been expanded to include *local legislators.* *Hernandez v. City of Lafayette*, 643 F.2d 1188 (5th Cir. Unit A June 1981), *cert. denied*, 455 U.S. 907, 102 S.Ct.

---

3. The development of legislative immunity and its importance to the establishment of a democratic form of government was not a new experiment in this country. The *Tenney* Court traced the history of legislative immunity back to Sixteenth Century England and the growth of a democratic form of government in that country:

> The privilege of legislators to be free from arrest or civil process for what they do or say in legislative proceedings has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries. As Parliament achieved increasing independence from the Crown, its statement of the privilege grew stronger. In 1523, Sir Thomas More could make only a tentative claim. In 1668, after a long and bitter struggle, Parliament finally laid the ghost of Charles I, who had persecuted Sir John Elliot and others for "seditious" speeches in Parliament. In 1689, the Bill of Rights declared in unequivocal language: "That the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament."

*Tenney v. Brandhove*, 341 U.S. 367, 372, 71 S.Ct. 783, 786, 95 L.Ed. 1019 (1951) (citations omitted).

4. *Tenney* raised the issue of whether Congress intended by the language of 42 U.S.C. § 1983 (formerly codified at 8 U.S.C. § 43) to abrogate the common law doctrine of legislative immunity and subject state legislators to the claims of individuals for acts done within the sphere of their legislative activity. The language of § 1983 makes liable, *"[e]very person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...." (Emphasis added.). Relying on the fact that legislative immunity is a concept deeply rooted in our historical traditions and a doctrine necessary to the efficient operation of a democratic form of government, the Supreme Court concluded that Congress never intended, by the broad language of § 1983, to "impinge on a tradition so well grounded in history and reason...." *Tenney*, 341 U.S. at 376, 71 S.Ct. at 788.

1251, 71 L.Ed.2d 444 (1982).[5]

■■■ Though *Tenney* established the premise that the common law doctrine of legislative immunity is available to state officials, this form of immunity is not available for every act that a legislative official might perform. Only those acts which are "necessary to preserve the integrity of the legislative process" are protected. *United States v. Brewster*, 408 U.S. 501, 517, 92 S.Ct. 2531, 2540, 33 L.Ed.2d 507 (1972). The Supreme Court "has not hesitated to sustain the rights of private individuals when it found Congress was acting outside its *legislative role.*" *Tenney*, 341 U.S. at 377, 71 S.Ct. at 788 (emphasis added). The position of the individual claiming legislative immunity, then, is not dispositive. It is the nature of the act which determines whether legislative immunity shields the individual from suit. Acts such as voting, *Kilbourn v. Thompson*, 103 U.S. 168, 204, 26 L.Ed. 377 (1880); *Healy v. Town of Pembroke Park*, 831 F.2d 989, 993 (11th Cir.1987); *but see, Cutting v. Muzzey*, 724 F.2d 259 (1st Cir.1984), speech making on the floor of the legislative assembly, *United States v. Johnson*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), preparing committee reports, *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), and participating in committee investigations and proceedings, *Tenney*, 341 U.S. at 377–79, 71 S.Ct. at 788–89 are generally deemed legislative and, therefore, protected by the doctrine of legislative immunity. On the other hand, acts such as the public distribution of press releases and newsletters, *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); *see also Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972) (no immunity for private publication of committee materials), the acceptance of bribes in return for votes on pending legislative business, *United States v. Brewster*, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972), the administration of penal facilities, *see Ryan v. Burlington County*, 889 F.2d 1286 (3d Cir.1989), and the denial of licenses, *Polenz v. Parrott*, 694 F.Supp. 599 (E.D.Wis.1988) (alderman and electrical inspector did not act in legislative capacity in depriving plaintiffs of their right to a fair hearing on their liquor license applications), *aff'd in part rev'd in part on other grounds*, 883 F.2d 551 (7th Cir.1989), are generally not protected by the doctrine of legislative immunity. These tasks are not an essential part of the legislative function. Construing Article I, § 6, the Supreme Court explained:

> Legislative acts are not all-encompassing. The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.

*Gravel*, 408 U.S. at 625, 92 S.Ct. at 2627.

Commissioner Davis and the other commissioners argue that their actions come within the ambit of legislative activity and are thus protected by the doctrine of legislative immunity. We consider the claims of Commissioner Davis and the other commissioners separately.

■■■ With respect to Commissioner Davis, all of the accusations made against him stem from the personnel decisions he made at Cooper Green Hospital—his decisions to hire, fire, and demote certain individuals. These decisions are clearly not "an integral part of the deliberative and communicative processes" by which legislators pass laws. Instead, they are administrative acts. The Third Circuit explained the difference: "Legislative acts are those which involve policy-making decision of a general scope or, to put it another way, legislation involves line-drawing. Where the decision affects a small number or a

---

**5.** Cases from the former Fifth Circuit decided prior to the close of business on September 30, 1981 are binding on this circuit. *Bonner v. City* *of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

single individual, the legislative power is not implicated, and the act takes on the nature of administration." *Ryan*, 889 F.2d at 1290–91. Because the decisions of Commissioner Davis involved no line-drawing and affected only a few individuals at Cooper Green Hospital, the policy-making power that is the cornerstone of legislative activity was not implicated. *See Meding v. Hurd*, 607 F.Supp. 1088, 1110 n. 28 (D.Del. 1985) (discharge of town police chief is non-legislative even where town council voted on the matter); *Coffey v. Quinn*, 578 F.Supp. 1464 (N.D.Ill.1983); Laurence H. Tribe, *American Constitutional Law* § 5–18, at 371 n. 9 (2d ed. 1988). Therefore, we find that the district court was correct in denying Commissioner Davis' motion for summary judgment on the basis of legislative immunity.

■ With respect to the other commissioners, they are accused of not acting to prevent Commissioner Davis from making the alleged improper personnel decisions at Cooper Green Hospital even after receiving several complaints. By resolution of the Jefferson County Commission, Commissioner Davis was given charge of Health and Human Services. As head of this department, Commissioner Davis "was delegated the responsibility for the conduct of personnel matters [at the hospital]." Brief For Plaintiffs–Appellees at 3. The personnel decisions that Davis made at Cooper Green were not reviewable by the other commissioners. They were the sole responsibility of Commissioner Davis. All parties agree that the only lawful action Commissioners Gunter, Katopodis, McNair, and Orange could have taken to stop Commissioner Davis from making the alleged improper personnel decisions would have been to re-distribute the assignments of the commissioners so that Commissioner Davis would no longer be in charge of Health and Human Services. This, everyone acknowledges, would have required the introduction of a resolution to that effect and a unanimous vote by all of the commissioners.[6] Ultimately then, Commissioners Gunter, Katopodis, McNair, and Orange are being sued because they did not introduce a resolution to the entire legislative body calling for the redistribution of assignments. We must, therefore, decide whether the act of refusing to introduce legislation for a vote is one which entitles the commissioners to legislative immunity.

■ In our opinion, the decision whether or not to introduce legislation is one of the most purely legislative acts that there is. Unlike the personnel matters which occupied the attention of Commissioner Davis, such decisions are an important part of the process by which legislators govern legislation and, therefore, entitle the decision-maker to the protection of legislative immunity. To conclude otherwise would require us to ignore the central purpose of the doctrine of legislative immunity. Legislative immunity evolved as a measure to protect the democratic integrity of the legislative process by guaranteeing that the other branches of government would not be able to exert undo influence over the decisions of democratically elected officials. When individuals can sue members of a legislative body to ensure that a certain piece of legislation is brought before that body for a vote, the process is no longer democratic. Thus, we hold that the decision of Commissioners Gunter, Katopodis, McNair, and Orange not to introduce a

---

6. According to the County Commission Organization Resolution:

  (4) The Commissioners are hereby assigned to the departments reflected opposite their names:
  1. Department of Finance and General Services .......... David Orange
  2. Department of Roads and Transportation ........ John Katopodis
  3. Department of Environmental Services .......... Chris McNair
  4. Department of Health and Human Services .......... Reuben Davis

  5. Department of Community and Economic Development ..... Jim Gunter
  The Commissioners shall hold the department assignments set out above concurrently with the current term of the County Commission. Provided, however, *the foregoing assignments may be changed during the term by a resolution of the Commission, unanimously approved, with all members present and voting.* Brief For Defendants–Appellants, Appendix, Vol. I, 1–105 at 2 (Emphasis added.).

piece of legislation seeking a reshuffling of commission assignments is legislative activity protected by the doctrine of legislative immunity. The district court's decision denying summary judgment to these commissioners must be reversed.

### Qualified Immunity

■ As an alternate theory, the commissioners argue that they are shielded from suit on the basis of qualified immunity. Because Commissioners Gunter, Katopodis, McNair, and Orange are legislatively immune from suit, we need not consider their claims with regards to qualified immunity. Instead, we focus solely on the claims of Commissioner Davis.

Qualified immunity is available to "government officials performing discretionary functions ... insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727–2738, 73 L.Ed.2d 396 (1982). "[T]he relevant question on a motion for summary judgment based on a defense of qualified immunity is whether a reasonable official could have believed his or her actions were lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred." *Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1503 (11th Cir. 1990).

In determining whether the doctrine of qualified immunity is applicable to Commissioner Davis, we must consider two questions: first, whether the laws allegedly violated by Commissioner Davis were clearly established at the time Davis acted, *Stewart,* 908 F.2d at 1503; *Rich,* 841 F.2d at 1564; and second, whether the appellees presented evidence sufficient to create a genuine issue of fact as to whether Commissioner Davis engaged in conduct violative of that clearly established law. *Stewart,* 908 F.2d at 1503; *Bennett v. Parker,* 898 F.2d 1530, 1532–34 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1003, 112 L.Ed.2d 1085 (1991). We review the facts in the light most favorable to the non-

moving party. *Goddard v. Urrea,* 847 F.2d 765, 767 (11th Cir.1988).

In *Brown v. City of Fort Lauderdale,* 923 F.2d 1474 (11th Cir.1991), a case not unlike this one, a black police officer sued the police department, the city of Fort Lauderdale, the city manager in his individual and official capacity, and the police chief in his individual and official capacity for firing him on the basis of his race. Reversing the district court's ruling that the case against the individual defendants should be dismissed on the basis of qualified immunity, we held that "[i]t is beyond doubt that the principal right allegedly violated by the defendants—the equal protection right to be free from intentional racial discrimination—was clearly established at the time [the police chief] and [the city manager] fired [the police officer]." *Id.* at 1478. It can hardly be argued that in the period between 1986 and 1989, when the events leading up to this lawsuit were taking place, that intentional race discrimination in the workplace was any less frowned upon by the laws of this society. *See, e.g., Washington v. Davis,* 426 U.S. 229, 239–41, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976). Therefore, we find that the laws allegedly violated by Commissioner Davis were clearly established.

■ As for the question of whether there exists evidence sufficient to create a material issue of fact regarding Commissioner Davis' allegedly discriminatory behavior, we rely on the affidavits and depositions submitted by appellees for our answer. These sworn statements support appellees' allegations that Commissioner Davis engaged in intentional discrimination in his hiring and firing practices.

Karan J. Cremer, a white woman, claims that Commissioner Davis' decision to hire Elizabeth Clark Bone, a black woman, to permanently fill the position of Nursing Supervisor for Maternal/Infant care was based on race. Ms. Cremer claims that the recruitment process for this position was, for monetary reasons, temporarily frozen by Commissioner Davis while Ms. Cremer was Acting Nursing Supervisor for Maternal/Infant Care and that the recruitment

process only got under way again when Ms. Bone applied for the position. In other words, Ms. Cremer contends that Commissioner Davis permitted the creation of this position to go ahead only when a suitable black person could be found to take the job. Ms. Cremer further claims that her masters degree and greater experience made her far better qualified for the position than Ms. Bone and that she was not selected solely because of her race.

The allegations of Russell Starkey, a white man, are not unlike those of Karan Cremer. He worked for the hospital as Credit and Collections Manager for three years as an independent contractor. Commissioner Davis decided not to renegotiate Mr. Starkey's contract and instead to create a permanent position in the hospital for a Credit and Collections Supervisor. However, Commissioner Davis opened the position only to four-year college graduates, thus, excluding Mr. Starkey who has only a two-year degree. Mr. Starkey claims that the four-year degree requirement was added intentionally so that he would not be considered for the position and so that the position could be offered to a black man, which in fact it was.

Ellie Higginbotham, Sharon Yeldell, and John Rohde relate similar stories in their affidavits and depositions. They too claim that the hiring and firing practices of Commissioner Davis were motivated by racial factors. In combination with these allegations, statements that Commissioner Davis made in his deposition "about being the first black commissioner and the fear he had when working for white people, would seem to present a fairly good fact question of whether or not he was motivated by racial discrimination or was simply sensitive in the matter of race." (Memorandum Opinion of Dec. 26, 1990, R2:169 at 6.). Therefore, we hold that the appellees have presented us with sufficient evidence to create a genuine issue of material fact and that summary judgment is not appropriate as it applies to Commissioner Davis.

### III.

For the foregoing reasons, we hold that Commissioners Gunter, Katopodis, McNair, and Orange are legislatively immune from suit in their personal capacities and we therefore REVERSE the district court's summary judgment order with regards to them. We further find that Commissioner Davis is not entitled to summary judgment in his personal capacity on the basis of either legislative or qualified immunity and thus AFFIRM the district court's order denying summary judgment as it applies to him.