596 A.2d 116

**Susan ABRAMS, et al.**

v.

**CITY OF ROCKVILLE, et al.**

**No. 1738, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Oct. 2, 1991.

---

**590**

**592**

Craig L. Silver and David R. Noonan, Gaithersburg, for appellants.

Roger W. Titus (Paula T. Laboy, Gregory L. Laubach and Venable, Baetjer and Howard, on the brief), Rockville, for appellees.

Argued before WILNER, C.J., and ALPERT and HARRELL, JJ.

WILNER, Chief Judge.

During the school years 1986–1988, the City of Rockville, through its Department of Recreation and Parks, operated what it called the Student Total Enrichment Program (STEP), designed to provide a variety of after-school activities to elementary school children of working parents. Jenifer Flannery and Steve Chriqui were employed to operate the program at the Fallsmead Elementary School.

It was customary at the Fallsmead program to show a video-tape movie to the children on Friday afternoons. On Friday, May 13, 1988, Flannery and Chriqui selected the movie *Poltergeist*, which they obtained from the local Erol's video store, to show to the children. *Poltergeist* is a ghost

story; indeed, it was chosen because that day was Friday, the 13th. One of the children in the program was seven-year-old Andrea Abrams who, according to her parents, became so traumatized by the movie that she began and continued to suffer great anxiety and psychological distress, manifested by sleeplessness, nightmares, and a fear of being left alone.

On January 26, 1990, Andrea and her parents filed a four-count complaint against Flannery, Chriqui, and the City in the Circuit Court for Montgomery County. Alleging that the movie was rated PG–13 and thus was suitable only for children over 13, they charged all three defendants with negligence (Count I), negligent infliction of emotional distress (Count II), and intentional infliction of emotional distress (Count III). In addition, Susan Abrams, Andrea's mother, charged the City with breach of contract (Count IV). After the completion of certain discovery, the defendants moved to dismiss the complaint or, in the alternative, for summary judgment. In an opinion and order filed September 20, 1990, the court granted the motion. Because it relied on evidence outside the complaint itself, the order, though purporting to dismiss the complaint, was actually in the nature of a summary judgment and will be treated by us as such. *See* Md. Rule 2–322(c).

Count II was dismissed on the ground that Maryland does not recognize negligent infliction of emotional distress as an independent tort. *Hamilton v. Ford Motor Credit Co.,* 66 Md.App. 46, 502 A.2d 1057 (1986). Count I, purporting to charge negligence, was dismissed because the court viewed it as "indistinguishable from Count II," and thus suffering from the same defect. Count IV, the breach of contract claim, was dismissed as time-barred by the special one-year statute of limitations imposed by Md.Ann.Code art. 23A, § 1A(c). Count III was dismissed on the ground that the operation of the STEP program was a governmental function and that the defendants therefore enjoyed sovereign immunity. This immunity was also assigned as an alternative ground for dismissing Counts I and II.

Although they now concede that Count II was properly dismissed, the plaintiffs complain in this appeal about the dismissal of each of the other counts. We believe that the court erred in dismissing Count I against the individual defendants, Flannery and Chriqui, but shall affirm the other parts of the judgment. For convenience, we shall consider the four counts in a somewhat different order than presented in the complaint.

### Count II (Negligent Infliction of Emotional Distress)

■ As we observed, Count II was dismissed principally because it did not present a cognizable claim under Maryland law. The court was entirely correct in so concluding. *Hamilton, supra.* Whether the defendants enjoy sovereign or governmental immunity is therefore irrelevant as to that count.

### Count IV (Breach of Contract)

■ Count IV was premised on the assertion that Susan Abrams had "contracted with [the City] through its S.T.E.P. program for an after-school program which would provide her daughter with a good socialization and educational experience through participation in supervised activities, games, field trips, educational programs and arts and crafts," for which Ms. Abrams paid a fee, and that the City breached that contract by showing Andrea the movie *Poltergeist.* In her answers to interrogatories, Ms. Abrams made clear that the alleged contract was written rather than oral, consisting of a written application prepared by the City that was filled out, signed, and returned by Ms. Abrams, along with her check for the tuition charge.

Md.Ann.Code art. 23A, § 1A precludes a municipal corporation such as the City from raising the defense of sovereign immunity in an action for breach of a written contract. Subsection (c) of that section, however, provides that "[a] claim is barred unless the claimant files suit within one year from the date on which the claim arose or within one year

after completion of the contract giving rise to the claim, whichever is later."

The contract sued upon provided for Andrea's participation in the STEP program during the 1988 spring semester, which ended no later than June, 1988. The actual breach, according to the complaint and the answers to interrogatories, occurred on May 13, 1988, when the movie was shown. Thus, the latest date, under the statute, for filing suit would have been in June, 1989. As noted, the complaint was not filed until January, 1990. Ms. Abrams' action was therefore clearly time-barred.

In an attempt to avoid this bar, the plaintiffs claim in their brief that Andrea herself also had a contract with the City "either as a direct contracting party or as a third party beneficiary," and that, because she remains a minor, the limitations period has not yet begun to run against her. There are two problems with this argument. First, Andrea did not sue on the contract, in any capacity. Count IV alleges that Susan was the contracting party and it seeks recovery for damage suffered by *her*, not by Andrea. Paragraph 47 of the complaint alleges that Susan suffered damage as a result of the breach "by being forced to expend large sums of money for medical and psychological counseling and treatment for her daughter's mental health." Although the *ad damnum* clause in Count IV sought judgment in favor of both Susan and her husband, Glenn, no recovery was sought by or on behalf of Andrea. Thus, even if a claim by or on behalf of Andrea would not be barred by the statute, the claim here was made by Susan (and possibly Glenn) to recover for their own losses.

Equally dispositive is the fact that the protection given to minors and others under disability does not apply to art. 23A, § 1A(c). That protection arises from Md.Ann. Code Cts. & Jud.Proc. art., § 5–201(a), which provides that, "[w]hen a cause of action subject to a limitation *under Subtitle 1 of this title* accrues in favor of a minor or mental incompetent, that person shall file his action within the

lesser of three years or the applicable period of limitations after the date the disability is removed." (Emphasis added.) The limitations periods provided for in Subtitle 1 of title 5, to which § 5–201 makes reference, are the general 3–year statute of limitations (§ 5–101), those dealing with "specialties" (§ 5–102), and those dealing with certain other specific kinds of civil or criminal actions (§§ 5–103 through 5–114).

The limitations provision embodied in § 1A(c) was enacted as part of the Act that precluded municipal corporations from interposing the defense of sovereign immunity in contract actions. *See* 1976 Md.Laws, ch. 450. That Act applied not only to municipal corporations but to the State and its counties as well. Identical provisions, as to both the waiver of immunity and the limitations period for filing claims against the governmental entity, were inserted in art. 41, dealing with the State, and in articles 25, 25A, and 25B, dealing with the counties. Previously, in *Redfern v. Holtite Mfg. Co.*, 209 Md. 106, 111, 120 A.2d 370 (1956), the Court had made clear that the statutory protection for persons under disability, then codified in art. 57, § 2 (1951 Md.Code), was limited to the causes of action specified in art. 57 and did not apply to the special limitations provision applicable to worker's compensation claims.

We must assume that the General Assembly was aware of the limited scope of that protection when it enacted ch. 450 and that, in placing the special one-year limitations provisions in the various articles dealing with the respective governmental entities rather than in title 5, subt. 1 of the Cts. & Jud.Proc. art., to which the material in art. 57 had been transferred, it made the conscious and deliberate choice not to have them subject to that protection. This assumption is bolstered by the fact that ch. 450 was a carefully considered and drawn statute. The legislature had attempted twice before to abrogate the defense of sovereign immunity in contract actions, but on both occasions the bill that passed was vetoed by the Governor. *See* 1974 Md.Laws 3087, veto of House Bill 5 (1974), and 1975

Md.Laws 4067, veto of House Bill 1672 (1975). Neither of those bills contained a limitations clause, and, although that deficiency was not expressly mentioned in the veto messages, the Governor did express concern over the uncertain fiscal impact of the bills. Ch. 450 not only attempted to address the Governor's reservations but was, in part, shaped and influenced by an Interim Report of a resuscitated gubernatorial Commission to Study Sovereign Immunity. *See* Report of that Commission, 100–01 and J–1—J–4 (November, 1976). Under the circumstances, we do not believe that either the wording or the placement of those provisions was inadvertent.

For these reasons, we find no error in the dismissal of Count IV.

*Count III (Intentional Infliction of Emotional Distress)*

▮ As we observed, the court dismissed Count III against all three defendants on the ground of sovereign immunity. We need not consider here whether that was a valid defense to the action, for it is clear on the record that the count was subject to dismissal for failure to state a claim.[1]

▮ Intentional infliction of emotional distress is a cognizable tort in Maryland. In order to recover, however, the

---

1. We are aware of the principle laid down in *Geisz v. Greater Baltimore Medical,* 313 Md. 301, 314 n. 5, 545 A.2d 658 (1988) and confirmed in *Orkin v. Holy Cross Hospital,* 318 Md. 429, 435, 569 A.2d 207 (1990) and again in *Boyer v. State,* 323 Md. 558, 594 A.2d 121 (1991), that

    "[o]n an appeal from the grant of a summary judgment which is reversible because of error in the grounds relied upon by the trial court the appellate court will not ordinarily undertake to sustain the judgment by ruling on another ground, not ruled upon by the trial court, if the alternative ground is one as to which the trial court had a discretion to deny summary judgment."

    This is a case in which we think it appropriate to rule upon the alternative ground. Where discovery on the issue has been completed and it is clear, as a matter of law, that the plaintiff cannot establish an element necessary to recovery, the defendant is entitled to summary judgment and the court is obliged to grant it. *See* Md. Rule 2–501(e).

plaintiff must show four things: (1) that the defendant's conduct was intentional or reckless; (2) that the conduct was extreme and outrageous; (3) that there was a causal connection between the wrongful conduct and the emotional distress; and (4) that the emotional distress was severe. *Harris v. Jones,* 281 Md. 560, 566, 380 A.2d 611 (1977); *Figueiredo–Torres v. Nickel,* 321 Md. 642, 653, 584 A.2d 69 (1991). Failure to allege or prove any one of these elements is fatal; here, there is a clear failure to establish the first two elements.

■ In recognizing this tort, the *Harris* Court essentially adopted the characteristics and contours of it as set forth in *Restatement (Second) of Torts,* § 46. It observed, from that source, that "the defendant's conduct is intentional or reckless where he desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct; or where the defendant acts recklessly in deliberate disregard of a high degree of probability that the emotional distress will follow." 281 Md. at 567, 380 A.2d 611. As to the second element, the Court, again citing § 46, noted that "[l]iability has been found only where the conduct had been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

In an attempt to meet these standards, the plaintiffs alleged that the defendants acted "in reckless disregard of the well-known fact that *Poltergeist* is a very frightening motion picture and would have an adverse effect on some children," that "[i]t was foreseeable that some children would be damaged by viewing *Poltergeist* and that said damage would be in the form of emotional distress," and that "Defendant [singular] had actual knowledge of Andrea's vulnerability to scary stories." This last averment presumably was based on the allegation in Count II that "Defendants had been notified that Andrea had been very frightened during a S.T.E.P. program when she heard a

scary Halloween story in October, 1986" and that they were told that "scary programs were not to be a part of the S.T.E.P. program when Andrea Abrams was involved." In answers to interrogatories, they added the charge that "[t]he movie's 'PG' rating by the Motion Picture Association (and the proper rating of 'PG–13' and the occasional rating of 'R') as well as the warning on the package should have been sufficient to forewarn the STEP employees that harm might result from showing this movie to young children."

In response to these averments, the defendants, in *their* answers to interrogatories, stated, without subsequent contradiction, that (1) *Poltergeist* "was requested by many of the children in the program since it was Friday the Thirteenth and many indicated they had seen it previously at home"; (2) the movie was rated PG, was contained in the catalog of Erol's, and "had been shown throughout the world in theatres and on network and cable television"; (3) some parents entered the room while the movie was being shown but made no comment about it;[2] (4) the children were advised that *Poltergeist* "is a ghost story that employs special effects to produce unreal situations," that it was stopped prior to the beginning of the special effects and the children were advised "that it is all Hollywood special effects, e.g., veins are only spaghetti; the blood is only ketchup; toys do not really come alive; none of this can happen in real life"; (5) the children were also told at that point that "if they didn't like scary movies, they should not watch any more, but should go out and join other children playing outside;" and (6) the defendants could recall no particular reaction from any of the children who watched the movie.

On this evidence, reasoning minds could perhaps differ over whether the showing of this movie to a seven-year-old,

---

2. In his own affidavit, Susan's father stated that he had entered the room just after the movie started, that he gave Andrea a snack and asked if she wanted to go home, but she said that she wanted to stay. He added that he "did not have the opportunity to see any portion of the movie" but did not explain why he did not have that opportunity.

or to Andrea in particular, was a wise or unwise, prudent or negligent thing to do; but a reasoning mind could not properly conclude that the defendants desired to inflict emotional distress on Andrea, or that they knew that such distress was substantially certain to occur, or that they acted in deliberate disregard of a high probability that such distress would follow. Indeed, it demonstrates quite the opposite—that there was some concern over the possible effect of some parts of the movie on the children, but that efforts were made to assure that the young viewers would not be adversely affected, and that there was no indication during the showing of the movie that those efforts were unavailing. That the child had been frightened once by a scary story told to her a year-and-a-half earlier, when she was five or six years old, is not enough to demonstrate a "high probability" that distress would ensue from the movie. As a matter of law, the plaintiffs failed to satisfy the first element and, indeed, by virtue of that same evidence, the second element as well. For *that* reason, there was no error in the judgment entered on Count III.

### Count I (Negligence)

As we observed, the court dismissed Count I on alternative grounds—that it was "indistinguishable" from Count II and that the defendants were immune from liability.

■ We differ with the court as to the first reason; we do not read Count I as attempting to charge negligent infliction of emotional distress. Though not as tightly drawn as it could have been, it seems to us to plead a case of simple negligence. The plaintiffs alleged that the defendants owed a duty to the plaintiffs to provide "wholesome supervised activities" and that they breached that duty "when the horror movie *Poltergeist* was shown to Andrea Abrams who was seven (7) years old at the time and clearly of an age when parental guidance for a PG or PG–13

motion picture was appropriate." [3]   They charged that in spite of the "frightening scenes and graphic representations of a gruesome nature, designed to terrorize its audience [Flannery and Chriquï] not only permitted the movie to continue but actively watched, exhibiting totally inappropriate behavior"; that the defendants did not inform the parents that a "horror movie" was to be shown to Andrea; and that, had they known, they would not have consented to it.

This breach, they claimed, caused Andrea severe injury; she "now suffers from great anxiety and psychological distress which compromises her functioning and causes her to exhibit outward symptoms including ... acute anxiety, sleep disturbance, nightmare, fear of being alone and emotional helplessness."   In answers to interrogatories, they added that, after having watched the film, Andrea refused to sleep in her own room alone, that she became "hysterical" and complained "that she couldn't breathe and was going to die," and that, as a result, Andrea had been undergoing continuous treatment by a psychologist at a cost to them of several thousands of dollars.

"To establish a cause of action in negligence a plaintiff must prove the existence of four elements: a duty owed to him (or to a class of which he is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages." *Jacques v. First Nat'l Bank*, 307 Md. 527, 531, 515 A.2d 756 (1986).   It seems clear to us that the plaintiffs have sufficiently alleged all four elements.

Certainly, the defendants had a duty flowing to both Andrea and her parents to refrain from causing harm to her.   That duty is implicit from the very nature of the program they were operating.   And, although we have concluded that the showing of *Poltergeist* did not rise to the level of recklessness or malevolence required for the tort of

---

**3.**   The plaintiffs now concede that the rating was "PG," rather than "PG–13."

intentional infliction of emotional distress, if the plaintiffs were to prove all of the facts and circumstances that they allege, a reasonable jury could rationally conclude that the showing of that movie to Andrea was imprudent and negligent—that harm was at least foreseeable, if not likely. The movie was rated "PG" by the Motion Picture Association of America, which means that "parental guidance" is advised. This alone suggests that the movie may not be suitable for small children.[4] The container in which the movie came described it as "[f]ascinating, frightening, as suspenseful as they come" and "[f]ull of spine-snapping chills." It said that a family's home is invaded by a "host of otherworldly forces" which are "anything but friendly" and if the family doesn't leave soon, "they'll all be swept off into nightmarish chaos." The 1987 General Catalog of Republic Pictures Home Video described the movie thusly: "The presence of menacing spirits terrorizes a middle-class family, transporting the youngest member into a 'world beyond'."

The defendants agreed at oral argument that the purpose of the movie was to frighten; its success, both artistically and at the box office, derives from the manner in which it achieved that purpose, in part through spectacular special effects. The issue, however, is not whether it is a good movie, but whether it was a suitable movie for the defendants to show to young children without prior notice to the parents. Under the circumstances alleged, a jury, we think, could find that it was not.

■ There is no real dispute here over the adequacy of the allegations as to causation—that the harm suffered by Andrea was the result of her watching the movie. The

---

4. Throughout the case the defendants stressed that *Poltergeist* was a classic, that it had been shown in theatres throughout the country and on both network and cable television. Even assuming that all those showings were of the same film, cut or uncut, as was shown to Andrea, that is beside the point. Parents can, if they wish, prevent their young children from seeing the movie in a theatre or on television; the children are not a captive audience in those settings. Indeed, that is precisely the purpose of the PG rating, to warn the parents of the need to exercise discretion.

remaining question, then, is whether the nature of her injury—the anxiety and psychological damage alleged will suffice in light of the requirement that mental distress is not actionable unless it results in some "physical injury." *See Vance v. Vance,* 286 Md. 490, 408 A.2d 728 (1979). That test is met here. Inability to sleep, hysteria, and nightmares have all been regarded as sufficient physical injury. *Vance* at 500–01, 408 A.2d 728.

We turn, then, to the issue of immunity, and it is here that we have some disagreement with the lower court's conclusions.

■■■ A municipal corporation such as the City of Rockville does not enjoy the same degree of sovereign immunity as the State. It possesses immunity in tort actions only if the conduct sued upon constituted the exercise of a "governmental" rather than a "private" or "proprietary" function. *Austin v. City of Baltimore,* 286 Md. 51, 405 A.2d 255 (1979); *Tadjer v. Montgomery County,* 300 Md. 539, 479 A.2d 1321 (1984); *Md.–Nat'l Cap. P. & P. Comm'n v. Kranz,* 308 Md. 618, 521 A.2d 729 (1987). Unfortunately, the distinction between these two functions is not entirely clear; it has been described as "illusory in practice," "difficult to discern, and more difficult to define," and "as logical as [the rules] governing French irregular verbs." *See Austin, supra,* 286 Md. at 59, 405 A.2d 255, quoting from earlier cases. In *Tadjer, supra,* 300 Md. at 546–47, 479 A.2d 1321, quoting *Baltimore v. State,* 173 Md. 267, 275–76, 195 A. 571 (1937), the Court stated:

"But in truth there is no universally accepted or all-inclusive test to determine whether a given act of a municipality is private [i.e., proprietary] or governmental in its nature, but the question is usually determined by the public policy recognized in the jurisdiction where it arises.... Where the act in question is sanctioned by legislative authority, is solely for the public benefit, with no profit or emolument inuring to the municipality, and tends to benefit the public health and promote the welfare of the whole public, and has in it no element of

private interest, it is governmental in its nature. And it is better that the adequate performance of such an act be secured by public prosecution and punishment of officials who violate the duties imposed upon them in respect to it than to disburse public funds dedicated to the maintenance of such public conveniences as public parks, playgrounds, hospitals, swimming pools, and beaches maintained at the public expense to private persons who have suffered loss through the negligence or default of municipal employees or agents charged with their management."

■ When one applies these notions to the record before us, it becomes clear that the STEP operation was governmental in nature. Although, as the plaintiffs point out, there may be private child care facilities in or around Rockville that serve the same purpose as the STEP program and thus, to that extent, the program may be regarded as in competition with private enterprise, that is only marginally relevant. The public schools are not proprietary because private schools exist; public parks and swimming pools are not proprietary because private parks and pools exist. This program was designed to provide an educational and socialization program to children in the city as well, no doubt, to safeguard and supervise them while their parents were at work. Moreover, the uncontradicted evidence, in the form of an affidavit from the director of the program, showed that the program "is established and operated in such a manner that revenues are neither anticipated to, nor do they, cover the costs of running the program." For the two fiscal years that Andrea was in the program, the revenues from the fees did not cover the expenses. Accordingly, we conclude that, because the program was of a governmental nature, the City of Rockville enjoyed immunity from direct suit, and that it was therefore appropriately dismissed as to Count I. *See Burns v. City of Rockville*, 71 Md.App. 293, 525 A.2d 255 (1987).

■ This leaves the question of the two individual defendants. Both by statute (Md.Ann.Code art. 23A, § 1B

and Cts. & Jud.Proc. art., § 5–321) and common law (*James v. Prince George's County*, 288 Md. 315, 323–24, 418 A.2d 1173 (1980), *Ashburn v. Anne Arundel County*, 306 Md. 617, 510 A.2d 1078 (1986), *Clea v. City of Baltimore*, 312 Md. 662, 541 A.2d 1303 (1988)), a "governmental representative" is relieved of liability for his negligent acts if "(1) the individual actor, whose alleged negligent conduct is at issue, is a *public official* rather than a mere *government employee or agent;* and (2) his tortious conduct occurred while he was performing *discretionary,* as opposed to *ministerial,* acts in furtherance of his official duties." *James, supra* (emphasis in original). We have already concluded that, on the record before us, Ms. Flannery and Mr. Chriqui did not act maliciously, and there is no suggestion that they either exceeded the scope of their authority or that the showing of *Poltergeist* was ministerial rather than discretionary in nature. The issue as to them, therefore, is whether they were "public officials" rather than "mere government employees or agents," for if they were not, they are not protected by *that* immunity.[5]

The distinction between "public officials" and ordinary employees is almost as blurred and uncertain as that between governmental and proprietary functions. In *Duncan v. Koustenis*, 260 Md. 98, 271 A.2d 547 (1970), the Court looked principally to four guidelines to determine when an employee is a "public official"—whether the position was created by law and involves continuing and not occasional duties, whether the holder performs an important public duty, whether the position calls for the exercise of some portion of the sovereign power of the State, and whether

---

5. Ms. Flannery and Mr. Chriqui may not be without some meaningful protection. Given the nature of the remaining action against them—for simple negligence committed within the scope of their authority—they would appear to be entitled to a defense by the City of Rockville and to have the City pay any judgment that might ultimately be rendered against them. *See* Local Government Tort Claims Act, Md.Ann.Code Cts. & Jud.Proc. art., §§ 5–401—5–404. That issue is not before us in this appeal, however, and we expressly do not decide it.

the position has a definite term for which a commission is issued and a bond and oath are required. As that Court further noted, however, a person not meeting all four of those guidelines may still be deemed a public official if he or she exercises "a large portion" of the State's sovereign power or may exercise police powers as a conservator of the peace.

Certainly, neither Ms. Flannery nor Mr. Chriqui can qualify as a public official under any of those standards. The record shows that their positions were as "Leader Staff." They neither ran the program nor were supervisors. It appears that they were employees who planned and supervised after-school activities for the children. There is nothing in this record to indicate that their positions were created by law, had a definite term, called for a commission, oath, or bond, or involved, except in the most minimal way common to thousands of public employees, the exercise of any significant portion of the State's sovereignty. Accordingly, we conclude that they were not public officials, that they therefore did not enjoy governmental immunity, and that the court erred in dismissing them with respect to Count I. To that extent, the case must be remanded.

JUDGMENTS AS TO COUNTS II, III, AND IV, AND AS TO CITY OF ROCKVILLE ON COUNT I AFFIRMED; JUDGMENT ON COUNT I IN FAVOR OF APPELLEES FLANNERY AND CHRIQUI REVERSED AND CASE REMANDED ON THAT COUNT FOR FURTHER PROCEEDINGS; COSTS TO BE PAID SEVEN–EIGHTHS BY APPELLANTS, ONE–EIGHTH BY APPELLEES FLANNERY AND CHRIQUI.