642 A.2d 298

James W. ARTIS, Jr.

v.

Bonnie Lee CYPHERS, Individually, etc.

No. 1615, Sept. Term, 1993.

Court of Special Appeals of Maryland.

June 8, 1994.

William R. Phelan, Jr., Sr. Sol. (Otho M. Thompson, Deputy City Sol. and Frank C. Derr, Associate Sol., on the brief), Baltimore, for appellant.

Kathleen Howard Meredith (David J. Wildberger and Semmes, Bowen & Semmes, on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., CATHELL, J., and JOHN F. McAULIFFE, Judge of the Court of Appeals (retired), Specially Assigned.

WILNER, Chief Judge.

This case arises from the alleged negligence of two ambulance crews in their emergency treatment of James R. Cyphers. On June 22, 1989, Mr. Cyphers was driving along Northern Parkway in Baltimore City when he suffered an asthma attack. He was able to enlist the temporary assistance of a passing motorist who, after driving a few blocks, spotted a private ambulance owned by Metropolitan Ambulance Service, Inc. The private ambulance crew rendered further assistance but, at some point, summoned a City ambulance. The City Medic Unit, operated by James W. Artis, Jr., appellant, and Steven Patrick, arrived at 3:09 p.m.

Because of his certification as a cardiac rescue technician, Artis took charge of Cyphers's treatment. There is some dispute as to Cyphers's precise condition upon Artis's arrival—even as to whether he was conscious or unconscious—and also as to exactly what Artis did to assist him. At some point after his removal to the City ambulance, Mr. Cyphers went into cardiopulmonary arrest. There is a dispute whether, at that time, Artis inserted an esophageal airway; he claims that he did, but other evidence suggests that he did not. Although they were then only a mile or two from Good Samaritan Hospital—a five minute trip—Artis continued to work with Cyphers at the scene, establishing radio contact with the hospital at 3:33 p.m. He and Patrick finally transported Cyphers to the hospital at 3:50 p.m., by which time Mr. Cyphers was in full cardiac arrest, had no pulse, and could not be resuscitated. He was formally pronounced dead at 4:56 p.m.

Cyphers's widow, for herself and her minor children and as personal representative of her husband's estate, filed a claim with the Health Claims Arbitration Office and also a wrongful death and survivor's action complaint in the Circuit Court for Baltimore City. Both actions named as defendants Metropolitan Ambulance Service, Inc., the crew operating Metropolitan's ambulance, the City, and Artis and Patrick. When the health claims were dismissed for want of jurisdiction, Ms. Cyphers filed an action to nullify that award, and the two actions, which rested on the same facts and sought essentially the same relief, were consolidated in the circuit court.

All defendants, it appears, moved for summary judgment. The motion filed on behalf of Metropolitan and its employees was denied, and, as of the date this appeal was noted, the case against them remained alive in the circuit court. Patrick's motion for summary judgment was granted, but the motion of Artis, which included the defenses of public official and good samaritan immunity, was denied. This appeal, by Artis, challenges only the court's ruling that he did not possess either public official or good samaritan immunity. Ms. Cyphers and her children have moved to dismiss the appeal as premature. We shall grant that motion.

### Discussion

It is undisputed that there is not yet a final judgment in the circuit court. Nor is there any claim by appellant that the order denying his motion is immediately appealable under Md. Code Cts. & Jud.Proc. art., § 12–303. The sole basis for the appeal is that the denial of Artis's claim of immunity is appealable under the collateral order doctrine.

Before discussing the elements of that doctrine, it would be well, we think, to consider the nature of the immunity asserted by Mr. Artis. As we indicated, there are two independent kinds of immunity claimed—public official immunity and "good samaritan" immunity.

The nature of public official immunity, under Maryland common law, was explained in *James v. Prince George's*

*County*, 288 Md. 315, 418 A.2d 1173 (1980). At 323–24, 418 A.2d 1173, the Court stated:

"Before a governmental representative in this State is relieved of liability for his negligent acts, it must be determined that the following independent factors *simultaneously* exist: (1) the individual actor, whose alleged negligent conduct is at issue, is a *public official* rather than a mere *government employee or agent;* and (2) his tortious conduct occurred while he was performing *discretionary*, as opposed to *ministerial*, acts in furtherance of his official duties [citations omitted]. Once it is established that the individual is a public official *and* the tort was committed while performing a duty which involves the exercise of discretion, a qualified immunity attaches; namely, in the absence of malice, the individual is free from liability [citations omitted]. The rationale underlying this grant of immunity 'is that a public purpose is served by protecting officials when they act in an exercise of their discretion.' "

Confirming principles enunciated in *Duncan v. Koustenis*, 260 Md. 98, 271 A.2d 547 (1970), the *James* Court recounted that there were four "principal guidelines" to be used in determining whether a public employee was a "public official" entitled to this immunity: whether the position was created by law and involves continuing and not occasional duties; whether the holder performs an important public duty; whether the position calls for the exercise of some portion of the sovereign power of the State; and whether the position has a defined term for which a commission is issued and a bond and an oath are required.

The Court also noted that these four guidelines "are not conclusive, and the emphasis which may be placed on each varies depending upon the circumstances present in each case." *Id.*, 288 Md. at 324, 418 A.2d 1173. It reminded us as well that there were "at least two well-recognized exceptions to the requirement that the above four factors be present," namely, "[A]n individual [who] fails to meet most of the above tests, and yet is nevertheless considered to be a public official, [is one] who exercise[s] 'a *large portion* of the sovereign power

of government' ... [as well as one] who can be called on to exercise police powers as [a] conservator of the peace.'" *Id.* at 324–25, 418 A.2d 1173.

The standard for determining whether the conduct of the actor is discretionary, as opposed to ministerial, was set forth by the *James* Court at 327, 418 A.2d 1173: "[A]n act falls within the discretionary function of a public official if the decision which involves an exercise of his personal judgment also includes, to more than a minor degree, the manner in which the police power of the State should be utilized." In this regard, the Court compared the driving of a fire truck, which involves some discretion but which the Court held was essentially ministerial, with the decision of a fire chief to destroy a "specific non-burning building in order to contain a fire in another nearby building," which the Court regarded as clearly discretionary.

These, then, are the kinds of rulings that must be made in determining whether a public employee is entitled to public official immunity. *See also Ashburn v. Anne Arundel County,* 306 Md. 617, 510 A.2d 1078 (1986); *Clea v. City of Baltimore,* 312 Md. 662, 541 A.2d 1303 (1988); *Abrams v. City of Rockville,* 88 Md.App. 588, 596 A.2d 116 (1991).

The good samaritan immunity claimed by Artis is found in Md. Code Cts. & Jud.Proc. art., §§ 5–309 and 5–309.1. Section 5–309(a) provides that a person described in subsection (b) is not civilly liable for any act or omission in giving any assistance or medical care if (1) the act or omission is not one of gross negligence, (2) the assistance is provided without compensation, and (3) the assistance is provided at the scene of an emergency, in transit to a medical facility, or through communications with personnel providing emergency assistance. Subsection (b) states four categories of persons, including members of a municipal rescue squad, as being entitled to this protection, provided that they possess at least one of three enumerated qualifications.

Section 5–309.1 affords rescue company personnel immunity from civil liability for any act or omission in the course of

performing their duties, other than "any willful or grossly negligent act" and other than with respect to actions for the negligent operation of a motor vehicle for which insurance coverage exists.

Entitlement to the qualified immunity afforded by these sections obviously requires a finding that the defendant satisfies the conditions stated in the statutes, not the least of which is a conclusion that he falls within the enumerated categories of persons protected and that his alleged negligence does not amount to gross negligence.

The seminal case in Maryland on the immediate appealability of an order rejecting an immunity defense is *State v. Hogg,* 311 Md. 446, 535 A.2d 923 (1988). In that case, which arose from the savings and loan debacle that struck the State in the mid–1980's, the Maryland Deposit Insurance Fund Corporation (MDIF), a State agency and successor by statutory merger with the former Maryland Savings–Share Insurance Corporation (MSSIC), sued certain former officers and directors of MSSIC to recover damages for breach of fiduciary duties owed to MSSIC. The defendants filed a counter-claim against MDIF, the State, and the State Division of Savings and Loan Associations, alleging that the harm claimed by MDIF resulted, at least in part, from the negligence of that Division. The counterclaim sought, alternatively, contribution and indemnification.

The State counterdefendants moved to dismiss the counterclaim on the ground of sovereign immunity. Regarding the counterclaim as a defensive maneuver in the nature of a claim for recoupment, the circuit court held that it was not barred by sovereign immunity and therefore denied the motion as to the State and MDIF. Those two entities took an immediate appeal from that ruling, urging that the appeal was permissible under the collateral order doctrine.

The Court of Appeals noted the four requirements of the collateral order doctrine as it exists in this State—the order must conclusively determine the disputed question, resolve an important issue, be separate from the merits of the action, and

be effectively unreviewable on appeal from a final judgment. It found no difficulty with the first three requirements and offered little discussion as to them. The one in question was the fourth—whether the order could be effectively reviewed in a later appeal from a final judgment. Relying largely on certain pronouncements in *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) and *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court observed that the defense of sovereign or public official immunity involves an immunity from suit—a right to avoid trial— not merely a defense to liability, and that "it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell, supra,* 472 U.S. at 526, 105 S.Ct. at 2815, quoted at 311 Md. 456, 535 A.2d 923. Thus, it held that, like a claim of double jeopardy, the erroneous rejection of sovereign immunity "would effectively escape review if the sovereign were forced to stand trial on that claim and await final judgment before obtaining appellate review." *Id.* at 456–57, 535 A.2d 923. Accordingly, the Court held that the denial of the counterdefendants' motion to dismiss was immediately appealable under the collateral order doctrine.

Less than four months after deciding *Hogg,* the Court issued its per curiam Opinion in *Bunting v. State,* 312 Md. 472, 540 A.2d 805 (1988). The Court there affirmed the decision of this Court dismissing an immediate appeal from an order of the circuit court declining to dismiss criminal charges against the appellant because of a violation of the "single transfer rule" embodied in the Interstate Agreement on Detainers (Md.Code art. 27, § 616D(d)). That section provides, in relevant part, that, when a prisoner is released to a requesting State pursuant to a detainer, if trial is not held on any indictment prior to the return of the prisoner to the sending State, that indictment shall be of no further effect and the court shall dismiss it. The appellant regarded this provision as a right not to be tried, much the same as the prohibition against double jeopardy, and thus believed he had a right to an immediate appeal to challenge the trial court's denial of his motion to dismiss.

The Court found no right of immediate appeal, concluding that the "single transfer rule" was more in the nature of a right to be returned to the sending State than a right to avoid trial in the receiving State. *Id.* at 479, 540 A.2d 805. It noted that there were a number of immunity-type rights that, in a broad sense, could be regarded as trial-avoidance rights but which did not permit interlocutory appeals, mentioning, among others, the States' right under the Eleventh Amendment to avoid being haled into Federal court as a defendant. It concluded, at 481–82, 540 A.2d 805:

> "In sum, the idea that an issue is not effectively reviewable after the termination of the trial because it involves a 'right' to avoid the trial itself, should be limited to double jeopardy claims and a very few other extraordinary situations. Otherwise, as previously indicated, there would be a proliferation of appeals under the collateral order doctrine. This would be flatly inconsistent with the long-established and sound public policy against piecemeal appeals."

In a footnote to that last sentence, the Court stated that *Hogg* should not be viewed as reflecting a contrary policy, adding that "[w]hile the opinion in that case may contain some broad language relating to assertions of immunity from the trial itself, such language must be read in the context of what was before the Court." Judge Eldridge, concurring, expressed the belief that the approach taken in *Bunting* indeed could not be reconciled with that taken in *Hogg* and that *Hogg* should be overruled. The fact is, however, that, so far, *Hogg* has not been overruled and thus remains the law.

Within days after the Court of Appeals filed its Opinion in *Bunting,* this Court decided *Board of Trustees v. Fineran,* 75 Md.App. 289, 541 A.2d 170 (1988). A former employee of Salisbury State College who, upon threat of dismissal, resigned his position, sued the college, the president of the college, the then-existing Board of Trustees, and the individual members of the Board for breach of contract, breach of statutory rights, and a variety of Constitutional and common law torts. All of the defendants moved to dismiss, or for summary judgment, raising among other defenses absolute

and qualified immunity. The circuit court denied the motions, and the defendants appealed.

Although their right to take an immediate appeal from what clearly were interlocutory rulings was not challenged by the plaintiff, and indeed was conceded by him, we addressed the point briefly, noting at 297, 541 A.2d 170:

"Ordinarily, an immediate appeal does not lie from the denial of a motion to dismiss or for summary judgment. Where the effect of that denial is a rejection of the defendant's claim of immunity from suit, however, such an appeal does apparently lie under the collateral order doctrine. *State v. Hogg,* 311 Md. 446, 535 A.2d 923 (1988), and cases cited therein."

In a footnote to that statement, we expressed concern about the apparent breadth of *Hogg,* even in light of *Bunting.* We said, in part:

"We would be less than candid if we did not express our concern about the breadth of this aspect of *Hogg* and the practical difficulties that are involved in allowing immediate appeals whenever the defense of sovereign or governmental immunity is rejected through the denial of a motion to dismiss or for summary judgment under Md. Rule 2–322. In *Hogg,* and in most (though not all) of the cases allowing these essentially interlocutory appeals, the issues relating to the immunity defense can be resolved without becoming too entangled in the facts and merits of the underlying claim. Indeed, it is that very separation that brings the case under the collateral order doctrine. That is not the situation here, however. As we shall see, one cannot resolve the immunity questions in this case without effectively deciding the merits as well. This is particularly a problem when the relevant facts, as pled or as shown, are in dispute, for we then have to view the facts in a very partial light and draw inferences and conclusions that the trier of fact ultimately may reject."

Notwithstanding this concern, we concluded that *Hogg* "articulates no distinctions between entangled and unentangled cases ..." and that, as evidenced by Judge Eldridge's concur-

ring Opinion in *Bunting,* while that case limited *Hogg* "in some undefined way," it did not overrule the earlier case. Our reading of *Hogg,* even in light of *Bunting,* convinced us, most reluctantly, that the appeal, raising issues of both absolute and qualified immunity, was procedurally valid.

The Court of Appeals returned to this issue in *State v. Jett,* 316 Md. 248, 558 A.2d 385 (1989). The plaintiff there sued the State because he had allegedly been falsely imprisoned by a local sheriff who, the plaintiff claimed, was a State official. The State moved to dismiss the complaint on the ground that the sheriff was not a State official. The circuit court denied the motion but, in doing so, held not only that the sheriff was a State official but also that, by virtue of the State Tort Claims Act, the State could be sued for the sheriff's conduct. The State took an immediate appeal from the denial of its motion.

The Court of Appeals dismissed the appeal, concluding ultimately that the issue raised was not one of trial avoidance but rather the reach of the Tort Claims Act. The thrust of that Act, which effected a broad waiver of immunity and manifested a consent to suit, was not an emphasis "on protecting state officials and employees from disruption in the performance of their duties by defending against tort claims" but rather was on protecting the public treasury by limiting financial exposure. *Id.* at 257, 558 A.2d 385. Thus, the Court held, the defense grounded on the Act was not like double jeopardy "and a very few other extraordinary situations" but was effectively reviewable after termination of trial because it did not involve a right to avoid the trial itself.

More significant to the present case than the actual holding in *Jett* is the Court's discussion of the issue. At 255, 558 A.2d 385, it characterized *Hogg* as involving "Maryland common law sovereign immunity in its full, unrestricted vigor" and recounted that:

"We analogized the rejection of the sovereign immunity defense to the rejection of public official immunity defenses where the United States Supreme Court has applied the collateral order doctrine. *See Mitchell v. Forsyth,* 472 U.S.

511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (denial of a claim of qualified immunity, *to the extent it turns on an issue of law* ); *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (absolute privilege)."

(Emphasis added.)

In a footnote to that statement, the Court observed that "[a] long line of United States Courts of Appeal decisions have been applying the collateral order doctrine to denial of absolute and qualified immunity defenses asserted by public officials who were sued for alleged torts, either of the federal constitutional variety or based on state law," citing several Federal and State decisions to that effect.

Following *Jett,* this Court, in *Rice v. Dunn,* 81 Md.App. 510, 568 A.2d 1125 *cert. denied,* 319 Md. 581, 573 A.2d 1337 (1990), entertained an immediate appeal by a District Court Commissioner from the denial of his motion for summary judgment based on absolute judicial immunity and, in the alternative, qualified immunity. We concluded, at 513, 568 A.2d 1125, that "the judicial immunity claimed in the case *sub judice* involves the right to avoid the trial itself. . . ." Judicial immunity, we held, was an absolute immunity. A similar result obtained in *Mandel v. O'Hara,* 320 Md. 103, 576 A.2d 766 (1990), where the Court held that the Governor, when exercising his Constitutional power to approve or veto bills passed by the General Assembly, enjoys absolute immunity. On that basis, the Court entertained an immediate appeal by former Governor Mandel from the denial of his motion for summary judgment based on such immunity.

The last case in the current Maryland chain is *Town of Brunswick v. Hyatt,* 91 Md.App. 555, 605 A.2d 620 (1992), where we entertained an immediate appeal by a municipal corporation, sued as the result of a slip and fall by the plaintiff at one of the town's municipal pools, from the denial of its motion for summary judgment alleging governmental immunity. Although the right of the appellant to take an immediate appeal was not questioned by the plaintiff, we relied on *Fineran* in accepting the appeal. In fact, the *Brunswick* case

goes a bit beyond *Fineran* in that the immunity asserted in *Brunswick* was the more limited immunity available to municipal governments that depends on whether the activity in question was governmental or proprietary in nature. In *Jett,* the Court noted that its discussion was limited to the State's sovereign immunity and did not "include governmental immunity of municipalities which, in application, can require fine distinctions to be made between proprietary and governmental activities."

Appellees make a number of points in their motion to dismiss. Essentially, they urge that the right to an immediate appeal from the rejection of an immunity defense should be limited to the rejection of a defense based on *absolute* immunity, which is resolvable as a matter of law, and should not be recognized when the defense is one of *qualified* immunity—either statutory or common law—which may be fact-based. They point out that the Court of Appeals has never approved (or disapproved) an immediate appeal from an interlocutory order rejecting a defense of qualified immunity, and they ask us to reconsider *Fineran* and, implicitly, *Brunswick.* Relying on the reasoning expressed in Justice Brennan's dissenting Opinion in *Mitchell v. Forsyth, supra,* 472 U.S. 511, 105 S.Ct. 2806, they urge in their brief that qualified immunity is "inextricably bound with the merits of the action and thus in no sense collateral to the ultimate question on the merits."

This argument implicates the third criterion in the collateral order analysis—whether the decision appealed is completely separate from the merits of the action—at least as much, if not more, than the fourth criterion expounded upon in *Hogg.* There is much to be said for it, and, as we earlier indicated, we made essentially the same point in *Fineran. Hogg,* however, as confirmed in *Jett,* seems to preclude the drawing of that kind of distinction.

In *Hogg,* 311 Md. at 456, 535 A.2d 923, the Court quoted the following passage from *Mitchell v. Forsyth, supra,* 472 U.S. at 526–27, 105 S.Ct. at 2815–16: "Accordingly, the reasoning that underlies the immediate appealability of an order denying

absolute immunity indicates to us that the denial of qualified immunity should be similarly appealable; in each case, the district court's decision is effectively unreviewable on appeal from a final judgment." The Court then stated that it had "recognized a similar rule" in *Public Serv. Comm'n v. Patuxent Valley Conservation League*, 300 Md. 200, 477 A.2d 759 (1984).[1] In citing *Mitchell v. Forsyth* in the later *Jett* case, the Court, as we noted above, characterized it as allowing an immediate appeal from the denial of a claim of qualified immunity "to the extent it turns on an issue of law."

Because the Court of Appeals has chosen to follow the lead of the Supreme Court in this general area, we need to look more closely at what the Supreme Court has actually done.

In *Nixon v. Fitzgerald, supra,* 457 U.S. 731, 102 S.Ct. 2690, a former defense department employee who had lost his job, allegedly because he had informed Congress of certain cost overruns and other shortcomings in the defense department, sued Mr. Nixon and others for conspiracy to deprive him of employment and besmirch his reputation. Nixon's motion to dismiss on the ground of "absolute Presidential immunity" was denied by the District Court; the Court of Appeals for the D.C. Circuit dismissed an interlocutory appeal, apparently on the ground that such immunity did not exist.

As a prelude to reaching the substantive issue, the Supreme Court concluded that an immediate appeal did lie in the case under the collateral order doctrine. It noted, at 742, 102 S.Ct. at 2697, that "[a]t least twice before this Court has held that

---

1. The issue in *Public Serv. Comm'n.* was not public official immunity in the traditional sense but whether, in an action for judicial review of a Public Service Commission order, the members of the Commission could be required to submit to a pre-trial discovery deposition. The circuit court denied the Commission's motion for protective order, whereupon the Commission appealed. Recognizing that the appeal was from an interlocutory discovery order, the Court nonetheless allowed it under the collateral order doctrine, regarding the situation as "analogous to that of a government official claiming immunity as a defense to a civil action" and citing *Nixon v. Fitzgerald* and *Forsyth v. Kleindienst,* 700 F.2d 104 (3d Cir.1983), the latter being the initial appellate decision in *Mitchell v. Forsyth.*

orders denying claims of absolute immunity are appealable under [that] doctrine," citing *Helstoski v. Meanor*, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979), involving a claim of immunity under the Speech and Debate Clause, and *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), involving a claim of double jeopardy. The Court assumed that the appellate court had dismissed the appeal on the ground that it did not present a "serious and unsettled question," which, under *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), is an additional requirement of the Federal collateral order doctrine. The Supreme Court concluded that the appeal *did* present such an issue, and for that reason, determined that the appeal was proper.

It was in *Mitchell v. Forsyth, supra*, 472 U.S. 511, 105 S.Ct. 2806, that the Supreme Court addressed the appealability of orders rejecting qualified immunity defenses. The case arose when, in 1970, on being apprised by the FBI of a conspiracy to blow up certain Federal property, John Mitchell, then the Attorney General of the United States, authorized a warrantless wiretap on the telephone of one William Davidon, a member of the allegedly subversive group. During the existence of that tap, certain conversations between Forsyth and Davidon were intercepted. Forsyth found out about the taps when facing unrelated criminal charges, and, following on the heels of the Supreme Court's conclusion in *United States v. United States District Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) that such warrantless wiretaps were not permitted in cases involving domestic threats to the national security, he sued Mitchell for violating his rights under both the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968.

For several years, the case traveled between the District Court and the Court of Appeals for the Third Circuit on the issue of Mitchell's asserted defenses of absolute and qualified immunity. The last District Court decision, on cross-motions for summary judgment, was that (1) Mitchell was not entitled to absolute prosecutorial immunity because he had conceded

that the wiretap was not ordered to facilitate any prosecutorial decision or further a criminal investigation but merely to gather intelligence needed for national security purposes, and (2) he was not entitled to qualified immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) because, in effect, he should have known that the wiretap was illegal even before the Supreme Court declared it so. Mitchell appealed the interlocutory decisions. The Third Circuit Court accepted the appeal from the denial of absolute immunity but rejected the defense on the merits; it held that an immediate appeal did not lie from the denial of qualified immunity, however, concluding that such appeals did not fall within the collateral order doctrine.

The Supreme Court granted *certiorari* to consider a number of issues. It first held that the Attorney General did not enjoy the kind of absolute immunity afforded to the President, legislators, and judicial officials performing judicial duties, but that he did have the qualified immunity set forth in *Harlow v. Fitzgerald.* That formed the central underlying basis of its subsequent discussion of appealability, and it is important to keep that context clearly in mind.

The essential holding in *Harlow* is that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738. As the *Mitchell* Court observed, 472 U.S. at 526, 105 S.Ct. at 2815, the Court in *Harlow*

"refashioned the qualified immunity doctrine in such a way as to 'permit the resolution of many insubstantial claims on summary judgment' and to avoid 'subject[ing] government officials either to the costs of trial or to the burdens of broad-reaching discovery' in cases where the legal norms the officials are alleged to have violated were not clearly established at the time."

The *Mitchell* Court continued, at 526, 105 S.Ct. at 2815: "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified im-

munity is entitled to dismissal before the commencement of discovery.... Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts. *Harlow* thus recognized an entitlement not to stand trial or face the other burdens of litigation, *conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law.* The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."

(Emphasis added in part.)

It was on that basis that a plurality of the Court (Justice White, Chief Justice Burger, and Justices Blackmun and O'Connor) concluded, with respect to the effective reviewability of the decision following trial, that "the reasoning that underlies the immediate appealability of an order denying absolute immunity indicates to us that the denial of qualified immunity should be similarly appealable: in each case, the district court's decision is effectively unreviewable on appeal from a final judgment." *Id.* at 526–27, 105 S.Ct. at 2816.[2]

The Court then turned to two other elements of the collateral order doctrine—whether the decision appealed conclusively

---

**2.** The Court's consideration of the appealability question was in Part III of the Opinion. The Opinion as a whole was authored by Justice White and joined in by Justice Blackmun. Chief Justice Burger and Justice O'Connor also joined in Part III. Justice Stevens concurred in the judgment of the Court because he believed that Mitchell was entitled to absolute immunity. Justices Brennan and Marshall dissented from Part III, finding "no justification for distinguishing between the denial of Mitchell's claim of qualified immunity and numerous other pretrial motions that may be reviewed only on appeal of the final judgment in the case." 472 U.S. at 543, 105 S.Ct. at 2824. Justices Powell and Rehnquist took no part in the decision. For purposes of convenience only, we shall use the term "the Court" rather than "the plurality" when referring to the pronouncements in Part III, fully understanding the difference between a plurality and a majority.

determined the disputed issue and whether it is collateral to the rights asserted in the action. Our interest here is in the latter. Again recalling that the Court's focus was exclusively on the qualified immunity provided for in *Harlow*, it observed, at 528, 105 S.Ct. at 2816:

> "An appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. *All it need determine is a question of law:* whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, in cases where the district court has denied summary judgment for the defendant on the ground that even under the defendant's version of the facts the defendant's conduct violated clearly established law, whether the law clearly proscribed the actions the defendant claims he took."

(Emphasis added.)

The Court noted that, in some instances, the resolution "of these legal issues" will entail consideration of the factual allegations made by the plaintiff but no more so, it concluded, than is the case with claims of double jeopardy or immunity under the Speech and Debate clause.

On this analysis, the Court held that a district court's denial of a claim of qualified immunity, "to the extent that it turns on an issue of law," is immediately appealable.

The plurality view in *Mitchell v. Forsyth* may be entirely appropriate when the qualified immunity at issue is that stated in *Harlow*, for the very reasons stated in Part III of the *Mitchell* Opinion. To take the plurality holding out of that context, however, and apply to it every form of common law or statutory qualified immunity that exists in Maryland is neither compelled nor rational. In *Harlow*, the Court "refashioned" the public immunity doctrine to cleanse it of subjective elements and present a unitary objective standard. That, and that alone, it seems to us, is what allowed the four Justices in *Mitchell* to view the issue presented in an immediate appeal as

being purely legal in nature and thus not requiring the appellate court, at that preliminary stage of the litigation, to become immersed in the underlying factual claims and responses.

That indeed, seems to be how the Federal appellate courts have construed *Mitchell.* Where the qualified immunity being asserted is the *Harlow* immunity and its existence does not hinge on unresolved disputed facts, immediate appeals have been allowed. *Clark v. Link,* 855 F.2d 156 (4th Cir.1988); *Childress v. Small Business Admin.,* 825 F.2d 1550 (11th Cir.1987); *Tomer v. Gates,* 811 F.2d 1240 (9th Cir.1987); *Huron Valley Hosp. v. City of Pontiac,* 792 F.2d 563 (6th Cir.), *cert. denied,* 479 U.S. 885, 107 S.Ct. 278, 93 L.Ed.2d 254 (1986); *Metlin v. Palastra,* 729 F.2d 353 (5th Cir.1984). Other courts have made clear, however, that, when "resolution of the immunity defense depends upon disputed factual issues, or upon mixed questions of fact and law, an immediate appeal will not lie, and review of the qualified immunity determination will have to await the [trial] court's resolution of the factual questions." *DiMarco v. Rome Hosp. & Murphy Memorial Hosp.,* 952 F.2d 661, 665 (2d Cir.1992) and cases cited therein. *Accord, Gorman v. Robinson,* 977 F.2d 350, 354 (7th Cir.1992); *Crippa v. Dukakis,* 905 F.2d 553, 556–57 (1st Cir.1990); *Feagley v. Waddill,* 868 F.2d 1437, 1441–42 (5th Cir.1989). The appeals in those cases were dismissed.

■ As we have observed in our discussion of the immunity grounds asserted by Mr. Artis, we are not being presented here with wholly legal issues. Whether Artis enjoys the good samaritan immunity he claims will depend on whether his alleged negligence constituted gross negligence, a matter that is in sharp dispute. Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence. *Romanesk v. Rose,* 248 Md. 420, 423, 237 A.2d 12 (1968); *compare Boyer v. State,* 323 Md. 558, 594 A.2d 121 (1991) and *Boucher v. Riner,* 68 Md.App. 539, 514 A.2d 485 (1986), where the facts, as pled or presented

on summary judgment, were found to be legally insufficient to warrant a finding of gross negligence.

A similar situation exists with respect to the common law qualified immunity asserted by Artis; that, too, depends on a number of fact-specific elements—those relating to whether he is a public official, whether he was engaged in discretionary as opposed to ministerial acts, and whether his conduct, if negligent, constituted gross negligence. There are, already, disputes as to each of these factors.

The Court of Appeals, on more than one occasion, has looked to the plurality pronouncements in *Mitchell v. Forsyth* as persuasive authority, and we certainly can do no less. But we shall accept them in their proper context, as we believe the Court of Appeals intended to do, and not extend them to circumstances that are foreign, and indeed antithetical, to their underpinnings.

There are instances when a defendant will raise in a Maryland court the public official immunity stated in *Harlow;* that is the test to be applied in actions arising under 42 U.S.C. § 1983. If that immunity is rejected on motion, an immediate appeal will lie. To that extent, we follow *Mitchell.* Where other forms of statutory or common law qualified immunity are raised, an intermediate step may be required.

Whether a defendant possesses a qualified immunity is ultimately an issue of law for the court to determine. To the extent that it depends on the resolution of disputed material facts, however, some of those disputes—the existence of gross negligence or malice, for example—may be for the trier of fact to resolve; others—whether the defendant is a public official and, if so, whether the duty he was performing was discretionary or ministerial—will be for the court. To the extent the issue hinges on factual disputes that must be resolved by the trier of fact, the court will not be able to resolve the legal issue on preliminary motion, thereby forcing the defendant to wait until judgment has been entered. Where the factual issues can be resolved by the court, the

parties may take advantage of Md. Rule 2–502 and have the court decide those facts, and with them the legal issue of immunity, preliminarily.[3]   In that circumstance, immediate appellate review of a ruling rejecting the qualified immunity defense would be permissible, for it would place the appellate court in no different position than if it were reviewing the rejection of an absolute immunity defense or a *Harlow* type of qualified immunity defense;  the issues would be legal ones.

We do not conceive this as inconsistent with any holding of the Court of Appeals, although it departs from our holding in *Fineran.*   We justify this result on three grounds:  first, as we indicated, the appellees in *Fineran* and *Brunswick* did not contest the right of the appellants to take an immediate appeal, and this is therefore the first case in which the issue has been squarely argued by the parties;  second, through *Jett,* which was not decided at the time of *Fineran,* we have gained greater insight into what was at issue in *Mitchell;*  and third, it is a far better result.

**APPEAL DISMISSED;**

**APPELLANT TO PAY THE COSTS.**

---

**3.**  Md. Rule 2–502 provides:

"If at any stage of an action a question arises that is within the sole province of the court to decide, whether or not the action is triable by a jury, and if it would be convenient to have the question decided before proceeding further, the court, on motion or on its own initiative, may order that the question be presented for decision in the manner the court deems expedient.   In resolving the question, the court may accept facts stipulated by the parties, may find facts after receiving evidence, and may draw inferences from these facts.   The proceedings and decisions of the court shall be on the record, and the decisions shall be reviewable upon appeal after entry of an appealable order or judgment."