643 A.2d 931

**Logan J. MANDERS, et al.**

v.

**Roland H. BROWN, et al.**

**No. 1893, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

July 5, 1994.

Certiorari Denied Dec. 7, 1994.

Lynn E. Stein, Princess Anne, for appellants.

Daliel Karp (Allen, Johnson, Alexander & Karp on the brief), Baltimore, for appellees.

Before DAVIS, MOTZ * and MURPHY, JJ.

DAVIS, Judge.

In this appeal, we are called upon to determine whether the appellees were properly afforded the shield of legislative immunity when they modified the Urban Renewal Plan without first holding a public meeting, allegedly in violation of the Crisfield City Code, Article XIII, § C13–5(B). Appellant asks us to decide that municipal officials who function in a legislative or administrative capacity or whose conduct involves enforcement designed to further allegedly corrupt or fraudulent motives do not have the broad immunity available for legislative acts. Because the record below does not permit us to determine whether the legislators in this case have restricted their functions to the traditional roles of speech and debate protected during legislative deliberations or actions indirectly required to carry on those deliberations, we remand this case for further proceedings in accordance with this opinion.

## THE CASE *SUB JUDICE*

Logan J. Manders appeals from an order of the Circuit Court for Somerset County granting a motion to dismiss his complaint against appellees, Roland Brown, Allison Milbourne, and Larry Tyler, who were Councilmen for the City of Crisfield at the time of the alleged wrongs, and Richard Scott, who was Mayor of the City of Crisfield at the time of the alleged wrongs. The genesis of this appeal, however, is an "Amended And Restated Complaint" filed on April 18, 1991 by Logan Manders, Crisfield Shipyard Properties, Ltd., and Crisfield Shipyard Services, Inc. (collectively "Manders") against appellees for misrepresentation (Count I), interference with a contractual relationship and prospective economic advantage (Count II), and misapplication of public funds (Count III). The relief sought was a money judgment. Manders's original

---

* Judge Motz participated in the argument and decision in this case but resigned from the Court prior to the filing of the Opinion.

complaint was in the form of a class action against the City of Crisfield, Mayor of Crisfield, and Crisfield City Council.

Trial was held on the claims set forth in Manders's "Amended And Restated Complaint" on September 9 and 10, 1991. At the conclusion of Manders's case-in-chief, appellees moved for a directed verdict and summary judgment. The court granted appellees' motion only as to Count III, which alleged misapplication of public funds. When all of the evidence was presented, appellees moved for judgment on the remaining counts and Manders made a motion for judgment. The trial court reserved decision on the motions for judgment. The jury returned a verdict in favor of Manders. As to the intentional misrepresentation count, the jury awarded plaintiffs $97,000 in compensatory damages and $100,000 in punitive damages; as to the interference with contractual relationship and prospective economic advantage count, Manders was awarded $200,000 in compensatory damages. Treating appellees' motion for judgment as a motion for judgment *non obstante veredicto* (n.o.v.), the court denied the motion. Judgment was entered on September 11, 1991.

Within 10 days after entry of judgment, appellees moved again for a judgment n.o.v. and alternatively for a new trial. The trial court ordered a hearing on appellees' motion. In the meantime, appellees obtained new counsel and supplemented their motion for judgment n.o.v. and alternatively a new trial. Eventually, on January 26, 1992, a hearing was held on appellees' motion for judgment n.o.v. and alternatively a new trial, and the trial court granted a new trial.

In response to the granting of a new trial, Manders filed for a writ of prohibition with the Court of Appeals, asserting that the trial court erred in granting a new trial. The writ and accompanying request for attorneys' fees were denied. Thereafter, appellees filed an answer stating as an affirmative defense that they are immune from liability under the doctrines of legislative and official immunity. In addition, appellees filed a motion for dismissal or summary judgment. Manders subsequently amended his "Amended and Restated Com-

plaint" by adding two constitutional tort counts: violation of the Maryland Declaration of Rights, Article 24 (Count IV) and violation of the Fourteenth Amendment to the U.S. Constitution (Count V). These amendments were titled "First Amendment to the Amended And Restated Complaint." In response, appellees filed another motion to strike or alternatively for dismissal.

After an unsuccessful attempt to have the case removed to federal court, Manders filed a motion for recusal of the trial judge. This motion was denied. Manders again amended his complaint ("Second Amendment to Amended And Restated Complaint") with a count alleging gross negligent misrepresentation and a count alleging negligent misrepresentation. Also added were many factual allegations regarding appellees' alleged deceptive scheme to gain government funding. On November 15, 1993, a hearing was held on appellees' motion to dismiss Manders's complaint; the motion was granted without an opinion.

Manders presents the following questions for review:

1. Did the trial court abuse its discretion [in] granting [appellees'] new trial motion?

2. Did the trial court commit error in refusing to recuse itself from the hearing on [appellees'] motion to dismiss?

3. Did the trial court commit error in granting [appellees'] motion to dismiss [Manders's] complaint?

## FACTS

Manders and his son owned and operated a shipyard located on the Little Annemessex River in Crisfield, Maryland. They conducted business through Crisfield Shipyard Properties, Ltd. and Crisfield Shipyard Services, Inc. Their main business since 1972 was building, repairing, and restoring boats. On October 11, 1987, two city blocks adjacent to Manders's property burned down, including "Tawes Lumberyard" and several old warehouses. Manders's property suffered only slight damage.

On October 13, 1987, Tony Bruce, the Crisfield City Solicitor, telephoned Manders and told him that the fire had provided the City with an opportunity to proceed with an urban redevelopment plan for the area. He also told Manders that his shipyard was inconsistent with that plan to rezone the area from commercial to tourist/maritime.

That night, a hearing was held concerning redevelopment of the area. The central project was to be the construction of an upscale mini-mall. The same night, some of the appellees, acting as Crisfield's City Council, enacted "Resolution 207" that declared the two burnt-out blocks and Manders's property to be an urban renewal area under Article XIII of the City Charter. In furtherance of the redevelopment plan, on February 7, 1988, the appellees, acting as Mayor and City Council, approved Urban Renewal Plan # 3 ("Project Phoenix"), after holding a public hearing on the matter. The plan included the construction of a mini-mall and pedestrian walkway located on the site of the destroyed Tawes Lumberyard. At the public hearing, owners of crab processing plants neighboring the renewal zone expressed disapproval of the mini-mall project because it would be inconsistent with the odor emanating from their plants. Manders asserts that appellees, acting through Mr. Bruce, the City Solicitor, agreed to swap a strip of City land on the western border of Manders's property (adjacent to the portion of 11th Street that was to be widened) for the portion of 10th street that bisected Manders's property. On March 15, 1988, Manders's property and other property in the urban renewal area were rezoned to tourist/maritime under Ordinance 428.

In reliance on the City's actions, Manders went forward with efforts to redevelop his property into a townhouse complex. Manders eventually contracted for sale of his property to a developer, contingent, *inter alia,* on the City's action to close a portion of 10th Street that bisected Manders's property and to go forward with the urban renewal plan.

In March 1989, appellees reviewed the development plan for Manders's property and, in June 1989, approved the site plan

for Manders's property. Manders contends that despite appellees' June approval of his site plan, in March, appellees secretly made substantial modifications to Urban Renewal Plan # 3 and had actually granted a permit for reconstruction of Tawes Lumberyard. The remaining redevelopment plans were limited to infrastructure expansions. Moreover, Manders states that, despite his involvement with the redevelopment and his regular business visits to City Hall, appellees never gave him notice of the change or held a public hearing on the matter. Manders asserts that the City Charter Article XIII requires such notice. Manders additionally contends that modification of the redevelopment plan had a detrimental financial impact on his contract for sale of the property.

Regarding the intentions of the appellees in not holding a public hearing prior to modifying Urban Renewal Plan # 3, Manders asserts that the appellees "were concerned that if [Manders] knew about the change then [he] might interfere with [appellees'] scheme to get funds from the government for the plan, but not implement it as regards the mini-mall and the condominium development on [his] property." In addition, appellees "sought to accommodate the objections of the crab house owners, as well as others who [appellees] viewed as important, influential and long-time citizens of Crisfield who could advance [appellees'] political careers and/or elevate their personal, social status within that community."

Pertinent portions of the trial court's opinion on the motion for judgment n.o.v. and alternatively a new trial provide the most telling account of how the case proceeded at trial:

> The court thinks, first of all, that this trial and the integrity of its outcome was virtually doomed from the outset by inadequate preparation on the part of both sides. I don't think the jury went off on a tangent.

> . . . . .

> I think the court's instructions here were correct in as far as they went based on what instructions were requested by counsel and the arguments that were made by counsel

regarding those instructions. Likewise, the rulings on evidence.

It is also clear to the court from the get go that this case was being presented to the court and to the jury as a suit against the City of Crisfield and against the named individuals in their official capacity as members of the city commission or the city council, whatever they call themselves.

It's clear to me that Mr. Bruce [the City Solicitor and counsel for appellees] thought so, I'm not sure I understand the full depth of why he thought so, and that he was in the case as the attorney for the City of Crisfield. Why that's somewhat unclear to me as to why Mr. Bruce apparently thought that as given the second amended complaint and his subsequently filed motions to dismiss it or strike it and the rulings on that make it difficult to understand why Mr. Bruce did not appreciate, once the second amended complaint had been filed, that this was no longer a suit against the City of Crisfield or against the individuals in their capacity as city commissioners, but against the named persons as individuals. That, incidentally, is a matter about which the court was not made aware until after the verdict had already been announced. It was not mentioned by either counsel prior to that point in time.

I don't know whether and cannot speak as to whether Mr. Stein [Manders's counsel] labored under the same misconception.... I do feel that either he did or was close to being disingenuous in the presentation of the case to the court and to the jury in terms of arguments concerning principles of law to the court, in terms of arguments concerning the facts to the jury. Thus, for example, evidence was presented by [Manders] concerning statements made to him by Mr. Bruce and the statements made to him by a Mr. Tyler who was planning director, not the same Mr. Tyler who is one of the parties to this case, as to this, that, or the other, offered without objection from the defendants, but equally without a shred of evidence as to any agency between Mr. Bruce and Mr. Tyler and these individual defendants as individuals, without the first shred of evidence that any of these individuals, much less all of them, directed Mr. Bruce or Mr. Tyler to make those representations to

Mr. Manders. Thus, it was argued by [Mr. Manders] for the jury to arrive at essentially the verdict that they did because the city did this, and the city did that, and the city did the other, without any evidence in this record . . . of any act done by any of them in their individual capacities.

.       .       .       .       .

[I]t was not until the jury had already arrived at their verdict that any contention was made on the part of the defendants that governmental immunity somehow or other came into play of this case. . . .

.       .       .       .       .

[T]he court must say that it views this case and the results with no confidence that the result was either just or proper. One is tempted to say that you had your day in court, you had your opportunity to raise issues raised. The temptation to say that would, I think, be considerably stronger if all of the errors had been unilateral on the part of the defendants, but I don't believe that they were. I may not be dealing with mutual mistake here, but the errors were as replete on one side as they were on the other.

### LEGAL ANALYSIS

### I

■ Manders's first argument is that the trial court erred in granting appellees' motion for a new trial. The standards governing appellate review of a trial court's decision to grant a new trial was carefully reviewed by the Court of Appeals in *Buck v. Cam's Broadloom Rugs, Inc.*, 328 Md. 51, 612 A.2d 1294 (1992). After reviewing the history of appellate review of a trial court's grant of a new trial, the court concluded that "the correct statement of the law in this area" is as follows:

The question whether to grant a new trial is within the discretion of the trial court. Ordinarily, a trial court's order denying a motion for a new trial will be reviewed on appeal if it is claimed that the trial court abused its discretion. However, an appellate court does not generally disturb the

exercise of a trial court's discretion in denying a motion for a new trial.

*Id.* at 57, 612 A.2d 1294 (quoting *Mack v. State,* 300 Md. 583, 600, 479 A.2d 1344 (1984)).

Under Maryland law, "the emphasis has consistently been upon granting the broadest range of discretion to trial judges whenever the decision has necessarily depended upon the judge's evaluation of the character of the testimony and of the trial when the judge is considering the core question of whether justice has been done." *Id.* In addition, when it becomes clear from extrinsic evidence that a jury's consideration of a case "was seriously distorted by information that should not have been before the jury, a trial judge may have little or no 'discretion' to deny a new trial." *Id.,* 328 Md. at 58, 612 A.2d 1294. Where a motion for a new trial asks the trial judge to draw upon his or her own view of the weight of the evidence, the net effect of accumulated errors or improprieties by counsel, or a determination of whether justice is served by the verdict, the judge's range of discretion is at its broadest. *Id.* at 59, 612 A.2d 1294.

In the case *sub judice* the trial court essentially concluded that the jury's verdict "was seriously distorted by information that should not have been before [them]." *See id.* at 58, 612 A.2d 1294. Thus, the court had "little or no 'discretion' to deny a new trial." *See id.* Due to the apparent inadequacies in the presentation of the cases of both parties, this case was presented in an improper and distorted manner.

Although appellant is correct in asserting that a public official acting in a discretionary capacity can, under Maryland law, be sued for malicious acts taken in his official capacity,[1] the trial judge's assessment of this trial was that the jury believed, erroneously so, that "this was a suit against the City

---

1.  Immunity for "[a]n official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment" is provided for the putative defendant as "an official or individual." MD.CODE (1974, 1989 Repl.Vol., 1993 Cum. Supp.), § 5–321(b)(1) of the COURTS AND JUDICIAL PROCEEDINGS ARTICLE.

of Crisfield, that these individuals were being named only in their official capacity as representing in human form the City of Crisfield." Manders directs us to portions of the transcript where references were made to the appellees as individuals; this does not, however, remedy the taint injected by the improper references and overall presentation of the case. Manders had amended his complaint so that the City of Crisfield was no longer a party. Furthermore, under Maryland law, the City of Crisfield is protected by governmental immunity for its torts committed while acting in a governmental capacity [2]. *See Board of Educ. of Prince George's County v. Mayor of Riverdale,* 320 Md. 384, 389–90, 578 A.2d 207 (1990); *Austin v. City of Baltimore,* 286 Md. 51, 53, 405 A.2d 255 (1979); *see also Anne Arundel County v. McCormick,* 323 Md. 688, 695, 594 A.2d 1138 (1991). We conclude that the trial judge did not abuse his discretion in granting a new trial.

## II

■ Relying on *Jefferson–El v. State,* 330 Md. 99, 622 A.2d 737 (1993) and MD. RULE 1232, Canon 3 C of the MARYLAND CODE OF JUDICIAL CONDUCT, Manders suggests that the trial judge erred in not recusing himself because he created the appearance that he could no longer act on this matter in an impartial manner. The only support provided by Manders is the cryptic allegation that "the trial court's view on [appellees'] 'immunity' as individuals for acts as public officials clearly suggested that it was impossible for [Manders] to receive an impartial hearing on [appellees'] motion to dismiss, given that [Manders's] claims concerned the actions of the [appellees] in their official capacity and sought to hold them liable in their individual capacity."

■ In *Jefferson–El,* the Court of Appeals stated that, in determining whether the trial judge created the appearance of impropriety, "the test is an objective one which assumes that a

---

2. There is no indication that the City of Crisfield waived this immunity.

reasonable person *knows and understands all of the relevant facts* ... [and then] would recuse the judge." *Id.* at 108, 622 A.2d 737 (emphasis in original) (quoting *Boyd v. State,* 321 Md. 69, 86, 581 A.2d 1 (1990)). In the case *sub judice,* it is apparent that Manders's complaint is limited to the trial judge's interpretation of the law. This does not create the appearance of impropriety; but, rather, it is the trial judge's authorized office to rule on matters of law. If a party believes that the trial court has ruled incorrectly, established procedures exist for appellate review. Indeed, Manders has sought our review of the trial court's interpretation of the immunity issue. It is the antithesis of our judicial system to suggest that a legal ruling against a party is *per se* grounds for recusal.[3]

In addition, it should be noted that the trial judge had equally admonished counsel on both sides and even took into consideration Manders's initial attempts to proceed *pro se.* The trial court did not abuse its discretion in denying the motion for recusal. *Id.,* 330 Md. at 107, 622 A.2d 737.

### III

Manders finally claims the trial court erred in granting appellees' motion to dismiss Manders's complaint. Despite the various amendments to Manders's complaint, the essential claim has remained the same, that appellees violated Crisfield City Code, Article XIII, § C13–5(B) when they secretly modified the urban renewal plan without first holding a public meeting and with the intention of benefitting certain constituents and themselves. Section C13–5(B) provides:

Modification. An urban renewal plan may be modified at any time.... Where the proposed modification will substantially change the renewal plan as previously approved

---

3. This is not to say that there could never arise circumstances where a consistent pattern of rulings formed the grounds for recusal.

by the municipality, the modification shall be formally approved by the municipality as in the case of an original plan. Formal approval in the case of an original plan is pursuant to § C13–5(A) and requires, *inter alia,* a public hearing.[4]

In response, appellees argue that the doctrine of absolute legislative immunity insulates them from suit on this matter. In a nutshell, they suggest that modifying Urban Renewal Plan # 3 was a legislative action falling under the doctrine of legislative immunity, even if they failed to follow required procedures and hold a public hearing prior to modifying that legislation.

---

4.  Section C13–5(A) reads in full:

Preparation.  The municipality, in order to carry out the purposes of this Article, shall prepare or cause to be prepared an urban renewal plan for slum or blighted areas in the municipality and shall formally approve such plan.  Prior to its approval of an urban renewal project, the municipality shall submit such plan to the planning body of the municipality for review and recommendations as to its conformity with the Master Plan for the development of the municipality as a whole.  The planning body shall submit its written recommendation with respect to the proposed urban renewal plan to the municipality within sixty (60) days after receipt of the plan for review.  Upon receipt of the recommendations of the planning body or, if no recommendations are received within said sixty (60) days, then without such recommendations, the municipality may proceed with a public hearing on the proposed urban renewal project.  The municipality shall hold a public hearing on a urban renewal project after public notice thereof by publication in a newspaper having a general circulation within the corporate limits of the municipality.  The notice shall describe the time, date, place and purpose of the hearing, shall generally identify the urban renewal area covered by the plan and shall outline the general scope of the urban renewal project under consideration.  Following such hearing, the municipality may approve an urban renewal project and the plan therefor if it finds that:

(1) A feasible method exists for the location of any families who will be displaced from the urban renewal area in decent, safe and sanitary dwelling accommodations within their means and without undue hardship to such families.

(2) The urban renewal plan substantially conforms to the Master Plan for the municipality as a whole.

(3) The urban renewal plan will afford maximum opportunity, consistent with the sound needs of the municipality as a whole, for the rehabilitation or redevelopment of the urban renewal area by private enterprise.

## A

The origin of the doctrine of legislative immunity or legislative privilege was carefully reviewed by Chief Judge Wilner in *Montgomery County v. Schooley,* 97 Md.App. 107, 627 A.2d 69 (1993).[5] Relying on federal case law, Judge Wilner concluded that it is " 'beyond dispute that municipal legislators enjoy the protection of immunity when acting in the sphere of legitimate legislative activity.' " *Id.* at 115, 627 A.2d 69 (quoting *Baker v. Mayor of Baltimore,* 894 F.2d 679 (4th Cir.), *cert. denied,* 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990)). Moreover, "[s]ubject to the consequences of the Supremacy Clause, that immunity, conferred as a matter of common law, appears to be co-extensive in scope with the Constitutional immunity enjoyed by members of Congress and the Maryland General Assembly." *Id.*

The privilege as it applies to Congress is found in the Speech or Debate Clause of the United States Constitution, Art. I, § 6; as to the Maryland General Assembly, the privilege is found in Article 10 of the Maryland Declaration of Rights and Art. III, § 18 of the State constitution. The majority of the Supreme Court case law focuses on the application of the federal constitutional privilege as it applies to Congress. Despite the common law origins of legislative privilege as it applies to local legislative bodies, federal and local privileges are essentially co-extensive. *Schooley,* 97 Md. App. at 115, 627 A.2d 69. Thus, in this context, a statement of law regarding a Member of Congress is applicable to a local legislator.

In *Schooley,* we adopted the Supreme Court's rationale regarding the scope of the privilege:

"The purpose of this immunity is to insure that the legislative function may be performed independently without fear of outside interference.... To preserve legislative inde-

5. *Mandel v. O'Hara,* 320 Md. 103, 112–21, 576 A.2d 766 (1990) also discussed the doctrine of legislative immunity, but in the limited context of a governor's exercise of his veto power.

pendence, we have concluded that 'legislators engaged "in the sphere of legitimate legislative activity" . . . should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.' " *Schooley*, 97 Md.App. at 116, 627 A.2d 69 (quoting *Supreme Court of Va. v. Consumers Union*, 446 U.S. 719, 731–32, 100 S.Ct. 1967, 1974, 64 L.Ed.2d 641 (1980)).

Supreme Court cases have purposefully read the Speech or Debate Clause " 'broadly to effectuate its purposes,' " *Gravel v. United States*, 408 U.S. 606, 624, 92 S.Ct. 2614, 2626, 33 L.Ed.2d 583 (1972) (quoting *United States v. Johnson*, 383 U.S. 169, 180, 86 S.Ct. 749, 755, 15 L.Ed.2d 681 (1966)), and have, therefore, reached "anything 'generally done in a session of the House by one of its members in relation to the business before it.' " *Id.* (citations omitted). Thus, voting by Members and the creation of committee reports are protected, *id.*, and a "Member's conduct at legislative committee hearings, although subject to judicial review in various circumstances, as is legislation itself, may not be made the basis for a civil or criminal judgment against a Member because that conduct is within the 'sphere of legitimate legislative activity.' " *Id.; see also Tenney v. Brandhove*, 341 U.S. 367, 377–78, 71 S.Ct. 783, 788–89, 95 L.Ed. 1019 (1951); *Kilbourn v. Thompson*, 103 U.S. 168, 204, 26 L.Ed. 377 (1881).

The cases also "make perfectly apparent, however, that everything a Member of Congress may regularly do is not a legislative act within the protection of the Speech or Debate Clause." *Doe v. McMillan*, 412 U.S. 306, 313, 93 S.Ct. 2018, 2025, 36 L.Ed.2d 912 (1973). The clause has not been extended beyond the legislative sphere. *Id.* Not everything a Member of Congress does in his/her official capacity is "legislative in nature." *Gravel*, 408 U.S. at 625, 92 S.Ct. at 2627. When a Member of Congress interacts with the Executive Branch or an administrative agency "—they may cajole, and exhort with respect to the administration of a federal statute—but such conduct, though generally done, is not protected legislative activity." *Id.; Johnson*, 383 U.S. at 172, 86 S.Ct. at 751 ("No argument is made, nor do we think that it could be

successfully contended, that the Speech or Debate Clause reaches conduct, such as was involved in the attempt to influence the Department of Justice, that is no wise related to the due functioning of the legislative process.").

Legislative acts are not all-encompassing. The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, *they must be an integral part of the deliberative and communicative process by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.* As the Court of Appeals put it, the courts have extended the privilege to matters beyond pure speech or debate in either House, but 'only when necessary to prevent indirect impairment of such deliberations.'

*Gravel,* 408 U.S. at 625, 92 S.Ct. at 2627 (citations omitted) (emphasis added).

The Supreme Court has "not fashioned a fixed invariable rule of immunity but has advised a discerning inquiry into whether the contributions of immunity to effective government in particular contexts outweigh the perhaps recurring harm to individual citizens...." *Doe,* 412 U.S. at 320, 93 S.Ct. at 2028. The case law has followed a " 'functional' approach to immunity law." *Harlow v. Fitzgerald,* 457 U.S. 800, 810, 102 S.Ct. 2727, 2734, 73 L.Ed.2d 396 (1982); *accord Mandel,* 320 Md. at 120, 576 A.2d 766. The pertinent question is, whether the person asserting immunity was "performing acts legislative in nature." *Harlow,* 457 U.S. at 810, 102 S.Ct. at 2734. Thus, the "starting point is at least a minimum familiarity with the [appellees'] functions and duties." *Doe,* 412 U.S. at 320, 93 S.Ct. at 2029.

Members of Congress acting in their legislative capacity are immune from liability "even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil

statutes." *Id.* at 312–13, 93 S.Ct. at 2025. In *Tenney v. Brandhove*, 341 U.S. at 377, 71 S.Ct. at 788, the Supreme Court declared:

> The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives. The holding of this Court in *Fletcher v. Peck*, 6 Cranch 87, 130 [3 L.Ed. 162 (1810) ], that it was not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestioned.

### 1

Extension of the legislative immunity doctrine to state local governing bodies has spawned a substantial body of federal case law under 42 U.S.C. § 1983.[6] Each court is challenged anew with the question of whether a particular action was within the sphere of legitimate legislative activity. Despite the Supreme Court's resistance to the creation of a "test" for legitimate legislative activity, some lower courts have groped for a definitional-type test.

Common to several decisions is the understanding that legislative acts include "those [acts] which involve policy-making decision[s] of a general scope or, to put it another way, legislation involves line drawing. Where the decision affects a small number or a single individual, the legislative power is not implicated, and the act takes on the nature of administration." *Yeldell v. Cooper Green Hospital, Inc.*, 956 F.2d 1056,

---

6. In *Mandel*, 320 Md. at 113, 576 A.2d 766, it was noted that § 1983 case law "may be persuasive authority as to the Maryland common law of public official immunity in a state law, nonconstitutional tort action against a state official."

1062–63 (11th Cir.1992) (quoting *Ryan v. Burlington County,* 889 F.2d 1286, 1290–91 (3d Cir.1989)); *accord e.g., Cutting v. Muzzey,* 724 F.2d 259, 261 (1st Cir.1984); *Orange Lake Assocs., Inc. v. Kirkpatrick,* 825 F.Supp. 1169, 1174 (S.D.N.Y. 1993), *aff'd,* 21 F.3d 1214 (2d Cir.1994); *Brown v. Smythe,* 780 F.Supp. 274, 279 (E.D.Pa.1992). Although the forgoing understanding is instructional in resolving legislative immunity issues, the nature of the activity or function remains the cornerstone of any evaluation. *See Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 579 (9th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985). The *Cinevision* Court observed that "Congress, as well as many state and local legislatures, may enact private, or other, bills that affect an individual or a narrowly defined group of individuals. We cannot say that such activities are not legislative." *Id.*

In addition, two circuits have adopted tests in addition to the "affectation" or "policy-making" test, which we do not find consonant with the policies undergirding the privilege.[7] We

---

**7.** The First Circuit, beginning with *Cutting,* 724 F.2d at 261 (a widely cited case), has followed a test that "focuses on the nature of the facts used to reach the given decision." Thus, "[i]f the underlying facts ... are 'legislative' facts, such as 'generalizations concerning a policy or state of affairs', then the decision is legislative. If the facts ... relate to particular individuals or situations, then the decision is administrative." In our view, this test is incongruous with the purpose of the immunity doctrine, which is to "preserve legislative independence." *Consumers Union,* 446 U.S. at 731–32, 100 S.Ct. at 1974. It is a venerable principal that "it [is] not consonant with our scheme of government for a court to inquire into the motives of legislators...." *Tenney,* 341 U.S. at 377, 71 S.Ct. at 788. Inquiry into the facts undergirding a legislative decision is precisely an inquiry into the motives of the legislator.

The Third Circuit has adopted as part of its inquiry a determination as to whether "constitutionally accepted procedures of enacting the legislation [were] followed in order to assure that the act is a legitimate, reasoned decision representing the will of the people which the governing body has been chosen to serve." *Ryan,* 889 F.2d at 1291. Although we agree that the following of constitutionally accepted procedures can be an indicator of legitimate legislative activity, we are not persuaded that it is necessary or sufficient to a finding of legitimate legislative activity. Certainly, legislation itself is subject to constitutional judicial review, *Gravel,* 408 U.S. at 624, 92 S.Ct. at 2626, but a Congress Member's conduct in enacting that legislation "may not be made the basis for a civil or criminal judgment" against him/her because enact-

**210**

prefer to follow the functional test established in the Supreme Court cases and make an individualized judgment based on the acts in question in light of the functions and duties of the legislative officials. *See, e.g., Bardoff v. United States,* 628 A.2d 86, 91 (D.C.App.1993); *Cinevision,* 745 F.2d at 579–80. *See also Mandel,* 320 Md. at 120, 576 A.2d 766 (applying the functional test).

▪ Not everything a Member of Congress does is legislative, *e.g., Gravel,* 408 U.S. at 625, 92 S.Ct. at 2627, and not everything a local legislative official does is legislative. Local legislative officials sometimes act as executives and administrators who enforce and administer the law, especially in county or commission forms of government where there is no separate executive official. *E.g., Hughes v. Tarrant County,* 948 F.2d 918, 920 (5th Cir.1991); *Crymes v. DeKalb County,* 923 F.2d 1482, 1485 (11th Cir.1991); *Front Royal and Warren County Industrial Park Corp. v. Town of Front Royal,* 865 F.2d 77, 79 (4th Cir.1989); *Cinevision,* 745 F.2d at 577–78; *Altaire Builders, Inc. v. Village of Horseheads,* 551 F.Supp. 1066, 1073 (W.D.N.Y.1982). In light of the different types of official actions that may be taken by local legislators, it has been aptly observed that "when municipal officials 'do more than adopt prospective, legislative type rules and take the next step into the area of enforcement, they can claim only executive qualified immunity appropriate to that activity.' " *Town*

ing that legislation is a protected activity. *Id.; see also Tenney,* 341 U.S. at 377–78, 71 S.Ct. at 788–89; *Kilbourn,* 103 U.S. at 204. We are not persuaded that the enactment of legislation by a constitutionally infirm process vitiates legislative immunity.

The *Ryan* Court correctly relies on *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) for the proposition that a one-house legislative veto is unconstitutional, but that does not mean that a one-house veto, unconstitutional as it may be, is not legislative action. Indeed, in *Chadha* the Supreme Court found that the one-house veto was "essentially legislative in purpose and effect." *Id.* at 952, 103 S.Ct. at 2784. The inquiry was not as to the "form" of the actions, but " 'whether [the actions] contain matter which is properly to be regarded as legislative in its character and effect.' " *Id.* (citation omitted). It was the legislative nature of the one-house veto, without passage by a majority of both Houses and presentment to the President, that made it unconstitutional. *Id.* at 958, 103 S.Ct. at 2787.

*of Front Royal,* 865 F.2d at 79 (quoting *Scott v. Greenville County,* 716 F.2d 1409, 1422–23 (4th Cir.1983)); *accord Hughes,* 948 F.2d at 920–21; *Crymes,* 923 F.2d at 1485; *Cinevision Corp.,* 745 F.2d at 580; *see also Altaire Builders,* 551 F.Supp. at 1073. Thus, for example, failure to comply with a court order to supply annexed parcels with sewer service was "zoning enforcement," *Town of Front Royal,* 865 F.2d at 79; ordering the institution of an action against a specific individual enforcing a general zoning ordinance was an "executive action," *Kuzinich v. County of Santa Clara,* 689 F.2d 1345, 1349 (9th Cir.1982); and monitoring and administering a contract between a municipality and concert promoter, including voting on proposed artists, was an executive action, *Cinevision,* 745 F.2d at 580.

## 2

■ Manders contends that the case *sub judice* does not fall within the privilege delineated in *Montgomery County,* 97 Md.App. 107, 627 A.2d 69, because the appellees "completely ignored any legislative process by secretly and surreptitiously changing the urban renewal plan without any bills, meeting, quorum, vote, minutes, openness—much less, a public hearing and public notice." In pertinent part, Manders's complaint alleges, as amended:

> 25. At a time precisely known by Defendants but unknown to Plaintiffs, the Defendants essentially gutted the City's Urban Renewal Plan, acting illegally and not in furtherance of the City of Crisfield's interests but in derogation of them. They did so by scrap[p]ing plans to build the mini-mall and pedestrian way on the site of Tawes Lumberyard, directly across [the] street from the Shipyard Property. Instead of acquiring Tawes Lumberyard for mini-shopping mall and pedestrian way, the new plan of the Defendants was to acquire only a small strip of land on that site adjacent to 11th Street in order to widen the street. . . .

.    .    .    .    .

27. Defendants had a duty to timely inform Plaintiffs of the changes they made to the Urban Renewal Plan. Section C13–5 (Subsection B.) of Article XIII of the City's Charter, required that Defendants give public notice and hold a public hearing on any substantial change to the Plan.

28. Yet Defendants gave no such notice or held any public hearing on their plan to drop the mini-shopping mall and pedestrian way, the centerpiece of the project, and allow instead the reconstruction of the lumberyard.

.     .     .     .     .

33. By scuttling the development of the mini-mall and condominiums and keeping it secret, Defendants could both (a) protect the crab house owners and their businesses from complaints about the crab house odors of the tourists and other outsiders ("foreigners" as they are generally known in Crisfield) who would be attracted to the mini-mall and condominiums, and (b) still appear to be going forward with an important development aspect of the plan (the condominiums) so as to qualify for continued government funding.

34. Continued government funding would enable Defendants to further accommodate the crab house owners by providing the money to enlarge 11th Street so that large trucks accessing the crab houses would have better and easier access, as well as provide the money to renovate and upgrade the sewers systems which serviced the plants. This would enable the crab houses to better dispose of the runoff and other waste materials of the plants, which pooled upon portions of their properties at times.

35. Defendants knew that if they disclosed their secret intentions to scuttle the development aspects of the plan to Plaintiffs, Plaintiffs would oppose them and possibly cause public opinion to force them to go forward with the original plan to the chagrin of the crab house owners.

.     .     .     .     .

40. Thus, Defendants made a wicked, abhorrent decision. They would not give notice, hold a public hearing or otherwise inform Plaintiffs of the change they made to the plan.

Rather they would allow Plaintiffs to continue to believe that the plan was going to be implemented. Plaintiffs then would have no reason to complain then [sic] about a change which they did not know about. And, by the time Plaintiffs became aware of the change, it would be too late for them to do anything about it. The road would be widened, the new sewer systems installed, and Plaintiffs would be financially ruined and unable to do anything about it.

41. And to make absolutely sure that Plaintiffs would not be able to go forward with their development plans under any circumstances, Defendants would withhold that portion of 10th Street which bisected their property and upon which the condominiums were to be built.

. . . . .

45. Defendants also stood bye [sic] and said nothing of their radical alteration of the urban renewal plan, as well as their then present intention not to make the 10th/11th Street swap while Plaintiffs negotiated and executed a $1.2 million sales contract of the Plaintiffs['] properties with a third party, knowing full well that the sales contract was premised upon the City's implementation of the urban renewal plan, and without implementation of this plan, the contract would be terminated by the buyer.

There is no dispute that the governing Code section requires "formal approval" of a "substantial modification" to a previously approved urban renewal plan. Appellees have not conceded that the modifications in question were substantial. In any event, the pertinent question is whether this modification, made without any of the formal approval requirements delineated in Code § C13–5(A) and (B) falls within the sphere of legitimate legislative activity.[8] Moreover, since we are reviewing a motion to dismiss, "we assume the truth of all relevant and material facts well pleaded and all inferences which can be reasonably drawn from those facts." *Stone v.*

---

8. In addressing this question, we are mindful that many issues are not before us, such as whether the Open Meetings Act was violated and whether the modifications are valid and enforceable.

*Chicago Title Ins. Co.*, 330 Md. 329, 333–34, 624 A.2d 496 (1993) (citing cases); *accord Garay v. Overholtzer*, 332 Md. 339, 350, 631 A.2d 429 (1993).

Manders asserts that appellees' actions in question were not "an integral part of the deliberative and communicative processes by which [local legislators] participate in ... proceedings with respect to the consideration and passage or rejection of proposed legislation ..." *See Gravel*, 408 U.S. at 625, 92 S.Ct. at 2627. We are aware that the decision of whether to modify existing legislation is potentially a "policy making decision." *See, e.g., Yeldell*, 956 F.2d at 1062. But that policy making decision must be within the sphere of legitimate legislative activity. Thus, there must be some manifestation that the council member was acting in some manner with regard to proposed legislation or in a manner that if not protected would impair the legislative process. *Gravel*, 408 U.S. at 625, 92 S.Ct. at 2627. Manders's complaint asserts that appellees were not acting on any such proposed legislation, but rather were acting outside the legislative process.

In addition to Manders's assertions as to the illegitimate nature of appellees actions, Manders's complaint implicitly, but quite clearly, asserts that appellees were merely enforcing Urban Renewal Plan # 3, albeit not to his satisfaction. The decision not to build the mini-mall was thus an executive function—the enforcement and administering of the Urban Renewal Plan # 3. As such it is not a legislative function.

### 3

Appellees' attempt to bolster their position by relying on the principle that legislative immunity encompasses a legislative official's decision whether to "introduce" legislation. *Yeldell*, 956 F.2d at 1063–64. It has been observed that, "[w]hen individuals can sue members of the legislative body to ensure that a certain piece of legislation is brought before that body for a vote, the process is no longer democratic." *Id.* In the case *sub judice*, Manders is not alleging that appellees should have introduced legislation; but, rather, he asserts that appellees' actions were outside the scope of legitimate legislative

activity or constituted the enforcement of previously enacted legislation that was passed.

Our analysis has focused on the nature of appellees' alleged actions and not the motivation behind those actions. Certainly, not every action that falls within the legislative sphere is legitimate. *E.g. Tenney,* 341 U.S. at 377, 71 S.Ct. at 788 (stating that the Supreme Court "has not hesitated to sustain the rights of private individuals when it found Congress was acting outside its legislative role."). Acts such as public distribution of press releases and news letters, *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), and the acceptance of bribes in return for votes on pending legislative business, *United States v. Brewster,* 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972), are generally not protected by the doctrine of legislative immunity.

Nonetheless, immunity under legislative privilege is not dependent upon good or moral purpose. Such a requirement would undermine the very purpose of the privilege. *E.g., Tenney,* 341 U.S. at 377, 71 S.Ct. at 788. Therefore, the privilege, if it applies to appellees in this case, cannot turn on Manders's assertions that the appellees "scuttled" the redevelopment plan to accommodate the influential crab house owners and Dana Tawes, the owner of the adjacent Tawes Lumberyard, or to benefit their individual careers and social status. If it is determined that appellees acted in their legislative capacity in modifying the urban renewal plan, the privilege may very well protect them even if they modified it to accommodate a particular group.

On remand, a determination must be made as to whether the appellees were acting within the sphere of legitimate legislative activity. We elect not to make this determination ourselves, so that all parties involved can put forth their arguments based on the principles we have enunciated in this opinion. In particular, the appellees will have an opportunity to refute what appears to be their functioning as executives enforcing legislation when they modified the existing Urban Renewal Plan. If appellees cannot establish that the actions

in question were taken while they were functioning as legislators, the legislative immunity defense should be rejected.

## B

Manders next asserts that, if his complaint was dismissed based on public official immunity (MARYLAND CODE (1974, 1989 Repl.Vol., 1993 Cum.Supp.), § 5–321(b)(1) of the COURTS AND JUDICIAL PROCEEDINGS ARTICLE)[9], it would be in error because he has alleged sufficient facts to show that appellees acted with malice, outside the scope of their employment and authority, and in a nondiscretionary capacity. In response, appellees contend that their actions were within the scope of their employment and, relying on *Elliott v. Kupferman*, 58 Md.App. 510, 473 A.2d 960 (1984), assert that Manders has not pled actual malice with the requisite factual specificity.

Section 5–321(b)(1) provides that "an official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action." In this context, malice "consists of the intentional doing of a wrongful act without legal justification or excuse. An act is malicious if it is done knowingly and deliberately, for an improper motive and without legal justification." *Elliott*, 58 Md.App. at 526, 473 A.2d 960. Furthermore, the mere assertion that an act "was done maliciously, or without just cause, or illegally, or with wanton disregard, or recklessly, or for improper motive" is not sufficient. *Id.* at 528, 473 A.2d 960. "To overcome a motion raising governmental immunity, the plaintiff must allege with some clarity and precision those facts which make the act malicious." *Id.; accord Sawyer v. Humphries*, 322

---

9. Appellees' motion to dismiss and appellate brief raise the issue of public official immunity (COURTS AND JUDICIAL PROCEEDINGS, art., § 5–321), as opposed to immunity for "ordinary employees" (§ 5–402). *See Abrams v. City of Rockville*, 88 Md.App. 588, 605 & n. 5, 596 A.2d 116 (1991). Thus, the applicability of § 5–402 is not presented in this appeal.

Md. 247, 261–62, 587 A.2d 467 (1991); *Robinson v. Board of County Comm'rs*, 262 Md. 342, 348–50, 278 A.2d 71 (1971).

In the case *sub judice*, Manders has alleged that appellees conspired to create the appearance that the entire redevelopment plan was going forward so that appellees could gain public support and government funding to improve the infrastructure for certain constituents.

In our view, Manders has alleged, with clarity and precision, facts sufficient to withstand a motion to dismiss on the basis of public official immunity. Purposefully modifying an existing urban renewal plan for a corrupt or fraudulent motive to benefit oneself or an influential constituent is a malicious act. Manders alleged that this modification was done secretly to gain government; if so, that conduct would be malicious. Furthermore, if appellees used Manders as a ploy to carry out the alleged scheme, they have acted maliciously.

The parties have also raised the issue of whether Manders has alleged sufficient facts to show that appellees were not acting within the scope of their employment. The "overall test" for making this determination is whether the alleged tortious acts

"were done by the [employee] in furtherance of the employer's business and were such as may fairly be said to have been authorized by him. By authorized is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to the employee by the employer." *Ennis v. Crenca,* 322 Md. 285, 293–94, 587 A.2d 485 (1991) (quoting *Sawyer,* 322 Md. at 254–55, 587 A.2d 467) (internal quotations removed).

Maryland Courts have also considered whether the employee's conduct was "actuated at least in part by a purpose to serve the master." *Sawyer,* 322 Md. at 255, 587 A.2d 467 (quoting *East Coast Freight Lines v. Mayor of Baltimore,* 190 Md. 256, 285, 58 A.2d 290 (1948)).

In *Ennis,* 322 Md. at 294, 587 A.2d 485, for example, the issue was not whether the allegations "evolve[d] or relate[d] directly to Ms. Crenca's position as an elected official"; but,

rather, the issue was whether "Ms. Crenca's conduct was in furtherance of the county's business and incidental to it, or, instead, was in furtherance of Ms. Crenca's interests." *Ennis,* 322 Md. at 294, 587 A.2d 485. Thus, it was reasonably inferable that Ms. Crenca's public statements made to discredit Ms. Ennis and other political opponents were not "in any way furthering Montgomery County's business." *Id.*

In the case *sub judice,* Manders has alleged that appellees' goals in modifying the Urban Renewal Plan were, *inter alia,* to benefit themselves, specifically their careers and social status in the local community, and the local crab house owners. Manders also asserts that the modification was "not in furtherance of the City of Crisfield's interests but in derogation of them." In our view, it can reasonably be inferred from these allegations that appellees were acting solely in their own interests and, therefore, not within the scope of their official employment.

## C

Manders asserts finally that the trial court erred if it dismissed his complaint because it failed to allege the breach of an actionable duty as suggested by appellees. Appellees contend that the breach of duty alleged by Manders was a duty owed to the public and that, absent a "special relationship" between Manders and appellees, Manders's tort claims fail. Other than a citation to *Ashburn v. Anne Arundel County,* 306 Md. 617, 510 A.2d 1078 (1986), appellees provide little argument on this issue.

Maryland Courts have addressed the distinction between public and private duty. Simply stated, the rule is as follows:

"Where [a public officer's] duty is absolute, certain, and imperative, involving merely the execution of a set task—in other words, is simply ministerial—he is liable in damages to anyone specially injured either by his omitting to perform the task, or by performing it negligently or unskillfully. On the other hand, where his powers are discretionary, to be exerted or withheld according to his own judgment as to

what is necessary and proper, he is not liable to any private person for a neglect to exercise those powers, nor for the consequences of a lawful exercise of them, where no corruption or malice can be imputed, and he keeps within the scope of his authority."

*Boyer v. State,* 80 Md.App. 101, 104–05, 560 A.2d 48 (1989) quoting *James v. Prince George's County,* 288 Md. 315, 326–27, 418 A.2d 1173 (1980), *modified,* 323 Md. 558, 594 A.2d 121 (1991) (quoting *Doeg v. Cook,* 126 Cal. 213, 58 P. 707, 708 (1899)).

In the case *sub judice,* Manders has alleged sufficiently that appellees acted with malice and also that appellees were not acting within the scope of their authority. Therefore, his complaint alleges facts sufficient to create an actionable duty. Dismissal on this ground would have been in error.

Appellees finally contend that, if this Court determines that the motion to dismiss was granted in error, we should remand for the court to consider the motion to strike. The trial judge has not ruled on that issue and, therefore, it remains for the trial judge to resolve.

**ORDER OF THE CIRCUIT COURT FOR SOMERSET COUNTY VACATED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID ONE–HALF BY APPELLEES AND ONE–HALF BY APPELLANT.**